## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| **GLEIKE TAXI INC.** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No. 1:13-cv-06715** |
| | ) | **Judge Amy St. Eve** |
| **DC TOPS LLC, et al** | ) | **M.J. Young B Kim** |
| | ) | **Jury Trial Demanded** |
| *Defendant.* | ) | |
| | ) | |

### DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES & COUNTERCLAIMS TO PLAINTIFF'S SECOND AMENDED COMPLAINT

Defendants DC Tops, LLC ("DC Tops"), Challenger Cab, LLC ("Challenger"), Sium Ghirmai, and Berhe Ainalem, Grand Cab LLC ("Grand"), and Tsegaye Kebede hereby submit this Answer, Affirmative Defenses, and Counterclaims to Plaintiff Gleike Taxi, Inc.'s ("Gleike") Second Amended Complaint:

### JURISDICTION & VENUE

1. Admit.

2. Admit.

3. Admit.

4. Admit.

5. Admit.

6. Admit.

7. Admit.

8. Admit.

9. Admit.

- 1 -

## FACTS COMMON TO ALL COUNTS

### Defendants

10.  Admit.

11.  Admit.

12.  Admit that Challenger and Grand do not have dispatch service, and that their affiliated drivers pick up passengers on the street.  Deny to the extent the allegation suggests that the affiliated taxi drivers work for Defendants Challenger or Grand.

13.  Admit.

14.  Admit.

15.  Admit that DC Tops earns revenue from dispatch fees, and admit that DC Tops and Challenger earn revenue from margins on insurance sales.  Deny that either company operates as an insurance broker, and the remaining allegations.

16.  Admit.

17.  Deny, for lack of personal knowledge.owns or controls the taxicabs or drivers affiliated with it.

18.  Admit that prior to the DCTC MTS regulations, changing paint schemes was typically the most significant expense incurred by a driver switching cab company affiliations.

19.  Admit that the DCTC has imposed a new red and grey paint scheme on all D.C. cabs. Deny that this has lowered the cost of switching cab companies, as DCTC's new MTS regulations have increased the cost for drivers to switch companies, due to to differences in the technologies, practices, and contractual terms of the various PSPs and MTSs used by different cab companies.

- 2 -

### District of Columbia Taxicab Regulations

20. Admit.

21. Admit.

22. Admit.

23. Admit.

24. Deny, for lack of actual knowledge as to the motivations of PSP providers.

25. Admit.

26. Deny for lack of actual knowledge.

27. Deny for lack of actual knowledge.

28. Admit that changing PSPs involved considerable expense. Deny the remaining allegations for lack of actual knowledge.

29. Deny for lack of actual knowledge.

30. Admit that some taxi companies who were able to become PSPs supported the New Regulations.

31. Deny for lack of actual knowledge.

### Emergency Rules

32. Admit.

33. Admit.

34. Admit.

35. Admit.

36. Admit that the Emergency Rule extending the installation deadline went into effect on July 31, 2013, not August 9, 2013.

37. Admit.

- 3 -

## DC TOPS' & CHALLENGER'S AGREEMENTS WITH GLEIKE

38.  Admit that on approximately August 10, 2013, Defendants DC Tops and Challenger contacted Gleike, or were contacted by Gleike, after having been informed that Gleike was the preferred PSP/MTS vendor by DCTC's Chief of Operations, Ernest Chrappah.  Chrappah strongly recommended that DC Tops and Challenger contact Gleike, which he stated was both an approved MTS vendor and had the capacity to meet the September 1, 2013 installation deadline. Chrappah gave the companies the contact information for Gleike's D.C. representative, Patrice Berthome.

39.  Deny for lack of actual knowledge, though admit that as of August 2013, both DCTC and Gleike represented to DC Tops and Challenger that Gleike was a certified PSP and approved MTS vendor.

40.  Admit.

41.  Deny.

42.  Deny.

43.  Deny.

44.  Deny for lack of actual knowledge.

45.  Admit that DC Tops considered applying for PSP status, and considered entering into an agreement with VIP, but only after it became clear in September 2013 that Gleike was failing to perform its contractual obligations. Deny the remaining allegations.

46.  Admit that DC Tops conducted negotiations with VIP and Verifone after it became clear in September 2013 that Gleike was failing to perform its contractual obligations. Deny the remaining allegations.

47.  Admit that DC Tops contacted DCTC about obtaining PSP status, with without

- 4 -

knowledge of the actual dates on which such contacts occurred.

48. Deny.

49. Deny the scheming allegation, and further deny that Gleike sent extension applications for all of the drivers for both DC Tops and Challenger. Gleike had failed to conduct any installations for either company during the period from August 13-August 31, 2013, as it had stated it would do at the time of the Agreements. As of August 30, 2013 Gleike had sent to DCTC only approximately 90 extension forms for DC Tops drivers, and only approximately 130-150 for Challenger drivers. After its initial submissions, Gleike would submit a few more applications every few days, but never obtained extensions for all the drivers for whom DC Tops and Challenger had provided the necessary information.

50. Deny, for lack of actual knowledge of the number of valid extensions received from DCTC through Gleike.

51. Deny, for lack of actual knowledge.

52. No response required, as the Agreements speak for themselves.

53. Admit that DC Tops never made payment, as Gleike never requested it, and never performed. Deny as to Challenger, as Gleike agreed that Challenger's drivers could pay the fees on the days on which Gleike performed the MTS installations. Because Gleike never installed any properly functioning MTSs, it never received payment, even though dozens of Challenger drivers showed up on their scheduled installation dates of September 2-September 9, 2013, with checks, to pay for the installations and equipment Gleike failed to provide.

54. No, response required, insofar as the Agreement speaks for itself. Admit that Gleike had an arrangement with Challenger that Gleike would replace Challenger drivers' meters with its own meters, and over the next three months, would install the new MTS-compliant software

on Challenger's old meters, which were generally superior to those installed by Gleike but for the software updates. Challenger was to store the old meters while Gleike was updating them. In January 2014, Challenger's drivers would have the option of either keeping the Gleike meters, or having their previous but updated old meters reinstalled. If the drivers chose not to reinstall their old meters, Gleike could keep them. DC Tops did not reach the stage of making a similar arrangement with Gleike.

55. Admit.

56. Deny, as the arrangement between Gleike and Challenger was always as described in ¶ 54, *supra*. Further deny, in that Challenger was unable to turn over the old meters as new meters were installed by Gleike due to Gleike failing to show up on any of the installation dates scheduled with DCTC and Challenger.

57. Deny, for lack of actual knowledge. Gleike's own meters did not work, so Gleike installed its own software on the existing meters in four Challenger cabs. None of the meters operated properly.

58. Deny.

59. Admit that Gleike obtain microprocessors and protocols for some of Challenger's existing meters. This occurred because none of Gleike's own meters could function in an MTS-compliant matter, and Gleike lacked enough meters and installation capacity to install its own non-functioning meters, and thus sought to upgrade the software on Challenger's meters to compensate for its failures.

60. Deny. Gleike's software installation on the four existing Challenger meters it attempted to upgrade was non-functional, and Gleike's impetus for attempting to do so was its own failure to comply with its obligations under the Agreement to provide new MTS-compliant

meters.

61.  Admit that Challenger terminated the Agreement for Challenger's failure to install the meters on the dates scheduled and required by DCTC, and its inability to provide any functional meters. Deny the remaining allegations.

62.  Admit.

63.  No response required, to the extent the Agreements speak for themselves.  Deny, to the extent the parties always agreed that Gleike would install the MTSs in the cabs, as was required by DCTC Regulation 603.2(c), which went into final effect on July 26, 2013, more than two weeks before the Agreements were signed.

## AGREEMENT BETWEEN GLEIKE AND GRAND

64.  Admit.

65.  Admit that several hundred drivers were affiliated with the Grand taxicab line in August 2013, though not employed by Grand.

66.  The allegation requires no response, as the Agreement speaks for itself.

67.  The allegation requires no response, as the Agreement speaks for itself.

68.  The allegation requires no response, as the Agreement speaks for itself.

69.  Deny, as the parties understood at all times that Gleike would be responsible for the installations, as it was required by law to do so as of DCTC's July 26, 2013 Rulemaking and Grand at all times lacked any capability to do so, and Gleike provided driver installation agreements to comply with the law and the parties' understanding.

70.  Admit that Grand intended to collect the device and installation fees on a monthly basis from drivers affiliated under the Agreement, as the original understanding Grand had with Gleike, there would be no upfront fees to the drivers, which Grand communicated to its affiliated

drivers.

71.  Admit that additional drivers were interested in affiliating with Grand to obtain lower MTS rates from the economies of scale it could obtain.  Deny the remaining allegations for lack of knowledge.

72.  Deny.

73.  Deny for lack of personal knowledge.

74.  Deny.

75.  Deny.

76.  Deny.

77.  Admit that on September 13, 2013, Grand paid Gleike $182,000.00 to cover the $230/cab Required Device Fee described in the Agreement and the Installation Fee of $50/cab described in the Driver Installation Agreements, to cover the 650 cabs described in the Agreement. Further admit that on approximately September 10, 2013, Grand tendered approximately 47 meters to Gleike.

78.  Deny, as it was Gleike that reneged on its agreement with Grand could collect the fees from the drivers under the Agreement on a monthly basis and then pay them to Gleike, and demanded the payment up front on September 13, 2013.  On September 13, 2013, Grand paid Gleike $182,000.00 to cover the $230/cab Required Device Fee described in the Agreement and the Installation Fee of $50/cab described in the Driver Installation Agreements, to cover the 650 cabs described in the Agreement.  On September 14, 2014, Grand began collecting $280.00 from its affiliated drivers to cover the lump sum payment to Gleike, but refunded their money after Gleike breached the contract.

79.  Deny, as it was Gleike that reneged on its agreement with Grand could collect the fees

from the drivers under the Agreement on a monthly basis and then pay them to Gleike, and demanded the payment up front on September 13, 2013. On September 13, 2013, Grand paid Gleike $182,000.00 to cover the $230/cab Required Device Fee described in the Agreement and the Installation Fee of $50/cab described in the Driver Installation Agreements, to cover the 650 cabs described in the Agreement. On September 14, 2014, Grand began collecting $280.00 from its affiliated drivers to cover the lump sum payment to Gleike, but refunded their money after Gleike breached the contract.

80. Admit that Gleike installed approximately 80 of its meter systems in Grand's driver's cabs from approximately September 15 until September 19, of which at least 75 did not function properly. The credit card readers would not interface with the taximeters, the readers often failed to read cards, and the GPS signal was weak, all of which prevented the drivers from being able to collect fares from customers.

81. Deny.

82. Deny.

83. Deny, as Grand made no such representation to its affiliated drivers.

84. Deny.

85. Deny, as it was Gleike that refused to provide the installations on the scheduled dates when the drivers arrived.

86. Admit that the drivers were angry, as a result of Gleike's failure to meet its contractual and lawful obligations as mandated by DCTC to install the meters on the scheduled dates.

87. Deny, as the few drivers who received non-functioning MTSs from Gleike sought for Gleike to make the systems functional, or to receive refunds, as did drivers who did not received

the scheduled installations.

88.  Admit that havoc broke out at the installation sites. Deny that it was because of the rumor that Gleike "reneged on the deal," as it was because Gleike was in actual breach of its Agreements with both Grand and the drivers, as drivers who showed up for installations as scheduled by Gleike did not receive installations due to Gleike's unwillingness or inability to do so and thus were unable to legally work, and had no prospect of doing so without an MTS system.

89.  Admit.

90.  Deny.

91.  Deny.

92.  Deny.

93.  Admit that Gleike terminated the Agreement on September 19, 2013. Further admit that Gleike had received only a small percentage of the old meters, because Gleike was unable or unwilling to replace them with new meters so the drivers could continue operation.  Deny that Gleike received only a partial payment of the Required Device Fees, as it received payment of those fees for all of the 650 required under the Agreement.  Further deny that Gleike was unable to peacefully install the System or that Grand misrepresented the terms of the Agreement to the drivers.

94.  Admit that Grand continued to collect fees from some drivers for a short period after Gleike terminated the Agreement in the hope Gleike would meet its obligations, and that such fees were refunded to the drivers when it became clear Gleike would not perform its contractual obligations.

95.  Admit that approximately 80 cabs received MTSs, of which approximately 75 were

non-functioning.

96.  Admit.

97.  Deny, as DCTC Commissioner Linton instructed Gleike at that meeting to conduct installations for the 650 drivers based on the $182,000.00 Grand had already fully paid without charging the drivers any additional fees.

98.  Deny.

99.  Deny.

100.  Deny.

## COUNT I
## (Breach of Contract)
## (All Defendants)

101.  No response required.

102.  Deny.

103.  Deny.

104.  Deny.

105.  Deny.

## COUNT II
## (Fraud)
## (DC Tops and Challenger)

106.  No response required.

107.  Admit.

108.  Deny.

109.  Admit.

**COUNT III**
**(Tortious Interference With a Prospective Business Expectancy)**
**(Grand Cab)**

110.  No response required.

111.  Deny.

112.  Deny.

113.  Deny.

**COUNT IV**
**(Defamation)**
**(Grand Cab)**

114.  No response required.

115.  Deny.

116.  Deny.

117.  Deny.

**AFFIRMATIVE DEFENSES**

118.  Provisions of the Agreements are preempted by District of Columbia law, as D.C. law requires that a PSP be responsible for installing the Modern Taxi Meter System, while the Agreement sought to place that responsibility on DC Tops, Challenger, and Grand.

119.  Gleike's fraud in causing Defendants to enter into the Agreement when Gleike had no intention or ability to perform the contract, as Gleike knew at the time it induced Defendants to enter into the Agreements that Gleike was unable and/or unwilling to provide the Modern Taxi Meter System according to the schedule set by the District of Columbia Taxicab Commission ("DCTC"), as further set forth in the Counterclaims.

120.   Gleike's unclean hands in causing Defendants to enter into the contract when Gleike had no intention or ability to perform the contract, as Gleike knew at the time it induced Defendants to enter into the Agreements that Gleike was unable and/or unwilling to provide the Modern Taxi Meter System according to the schedule set by the District of Columbia Taxicab Commission ("DCTC"), and preventing the contract from being performed by terminating it by refusing to install the meters according to the installation schedule agreed upon with Challenger, DC Tops, and Grand.

121.   Provisions of the Agreements are void, unconscionable, and illegal as against Illinois public policy, including any provisions construed as obligating Defendants to pay Gleike without respect to Gleike providing or being able to provide the agreed-upon consideration, namely, the legally-compliant Modern Taxi Meter System according to the schedule set by the District of Columbia Taxicab Commission ("DCTC"), as well as any provisions construed as requiring Defendants to pay Gleike's legal fees without regard to the merits of Gleike's claims.

122.   Gleike has failed to state a claim upon which relief may be granted by failing to state in the Complaint any contractual performance that might entitle it to consideration from Defendants.

123.   Gleike is estopped by its own conduct from claiming breach, as Gleike was unable and/or unwilling to provide the Modern Taxi Meter System according to the schedule set by the District of Columbia Taxicab Commission ("DCTC"), and preventing the contract from being performed by terminating it by refusing to install the meters according to the installation schedule agreed upon with Defendants.

124.   Failure of consideration by Gleike's non-performance on the contract, as Gleike was unable and/or unwilling to provide the Modern Taxi Meter System according to the schedule

set by the District of Columbia Taxicab Commission ("DCTC"), and preventing the contract from being performed by terminating it by refusing to install the meters according to the installation schedule agreed upon with Defendants.

125.  Gleike frustrated the Agreements' purpose, as Gleike was unable and/or unwilling to provide the Modern Taxi Meter System according to the schedule set by the District of Columbia Taxicab Commission ("DCTC"), and preventing the contract from being performed by refusing to install the meters according to the installation schedule agreed upon with Defendants to comply with the law.

126.  Gleike's anticipatory repudiation of the Agreement by refusing to install the meters according to the installation schedule agreed upon with Defendants to comply with D.C. law.

127.  Gleike's cancellation of the contract by refusing to install the meters according to the agreed-upon schedule with Defendants precludes its right to any damages.

## COUNTERCLAIMS

### PARTIES

1.      Defendant/Counter-Plaintiff DC Tops, LLC is a District of Columbia limited liability company, all of whose members are citizens of D.C., Virginia, or Maryland.  Grand is the assignee of all rights its affiliated drivers may have against Gleike for breach of either the Agreement or the Driver Installation Agreements.

2.      Defendant/Counter-Plaintiff Challenger, LLC is a District of Columbia limited liability company, all of whose members are citizens of D.C., Virginia, or Maryland.  Challenger is the assignee of all rights its affiliated drivers may have against Gleike for breach of either the Agreement or the Driver Installation Agreements.

3.      Defendant/Counter-Plaintiff Grand Cab LLC is a District of Columbia limited

liability company, all of whose members are citizens of D.C., Virginia, or Maryland.  Grand is

the assignee of all rights its affiliated drivers may have against Gleike for breach of either the

Agreement or the Driver Installation Agreements.

    4.      Plaintiff/Counter-Defendant Gleiki Taxi Inc. ("Gleike") is an Illinois corporation.

## JURISDICTION

    5.      This Court has jurisdiction over the parties and this cause of action pursuant to

their Agreement, and 28 U.S.C. § 1367(a) and Fed.R.Civ.P. 13.

## BACKGROUND

    6.      The District of Columbia Taxicab Commission ("DCTC") mandated on July 26,

2013 that all D.C. cabs have a credit card swipe system ("the system") installed no later than

September 1, 2013. Such systems could be provided only by DCTC-approved Payment Service

Providers ("PSPs").  DCTC later extended the deadline to September 30, 2013, for any cab that

had a signed contract and extension requested by a PSP.

    7.      Gleike was a DCTC-approved PSP.  At all times, its representative who dealt with

Counter-Plaintiffs was Patrice Berthone.

### Gleike's Agreement With DC Tops & Challenger

    8.      After losing their prior PSP/MTS provider when it pulled out of the D.C. market,

and with the September 1 deadline less than a month away, DC Tops, through its manager,

Abebe Abadi, sought guidance on approximately August 8, 2013 from DCTC's Chief of

Operations, Ernest Chrappah.  Chrappah strongly recommended that DC Tops contact Gleike,

which he stated was both an approved MTS vendor and had the capacity to meet the September

1, 2013 installation deadline.  Chrappah gave Ababi the contact information for Gleike's D.C.

representative, Patrice Berthome.  Chrappah gave similar advice at that time to Challenger.

9.      Defendants/Counter-Plaintiffs DC Tops and Challenger entered into Agreements with Gleike on approximately August 12, 2013, for the purpose of complying with the credit card swipe system mandate by which Gleike would, as a PSP, provide and operate the MTS. Under DCTC Regulation 603.2(c), Gleike was obligated to install the MTSs itself, and that was the parties' understanding at the time of the Agreement, and Gleike agreed to provide separate driver installation contracts for each driver who would receive an MTS under the Agreements.

10.     Both because of the DCTC regulation requiring that Gleike be the MTS installer, and because Grand lacked the technical capacity to install the MTS in its drivers' cars, DC Tops and Challenger agreed to pay Gleike an additional fee of $50 per car for the installation pursuant to separate agreements with each driver.

11.     Gleike did not at any time send Counter-Plaintiffs an invoice for its equipment, and made no request for payment.  For Challenger, Gleike agreed that individual drivers would pay at the time of installation.  For Grand, Gleike made no mention of payment, except as a justification for terminating the Agreement on September 6, 2016.

12.     At the time of the Agreement, the Challenger and Gleike understood that drivers would provide their old meters to Gleike, to be replaced with Gleike's meters.  If the drivers elected, Gleike would then modify the old meter (which was superior in several respects to Gleike's meter) to make it MTS compliant, and then switch it back out within 90 days.  At all times, it was understood that Gleike would receive the old meters only as it replaced them with new ones, as the drivers could not operate without a meter.

13.     Berthome assured the DC Tops representatives that Gleike would apply for the extension, that the installations would begin August 16, and that Gleike could have all installations completed by the legally mandated September 30 deadline.  The parties signed the

Agreement. Challenger learned from DC Tops of its discussions with Berthone, and based on the same representations by him, signed a virtually identical Agreement on August 13 as well. Gleike was to begin Challenger's installations on September 2. At the time the Agreements were signed, Berthone did not request payment, or provide instructions as to how Gleike was to be paid.

14.     Bethome told the DC Tops representatives that as of August 13, Gleike already had about 2000 drivers signed up from various DC cab companies, that its goal was to get at least 3000 drivers, and that Gleike was fully equipped to carry out its PSP responsibilities, including installations.

15.     After the Agreement was reached on August 13, Abadi waited for Berthone to contact him with an installation schedule. Hearing nothing from Berthone, Abadi called him on August 17 to inquire why installations had not begun as agreed the day before, August 16. Berthone stated Gleike did not have enough personnel and installation sites to perform the scheduled installations. The next day, August 18, Berthone claimed he was seeking to have another company, C & E Taxi Meter Service perform Gleike's installations, and that he would let Abadi know when they were ready. Again hearing nothing, Abadi called and texted Berthone on August 20, 21, and 22, and reached a full voice mail box, and received no text response.

16.     On August 22, DC Tops owner, Solomon Bekele, emailed Berthone requesting clarification and/or modification of several contractual terms. Berthone did not respond until August 26. That same day, Abadi again asked Berthone over the phone when the installations would begin; Berthone stated he lacked sufficient equipment, personnel, and facilities to perform the installations. The next day, August 27, Abadi sought unsuccessfully to reach Berthone by phone and text.

17.     On August 30, Berthone texted Abadi to let him know the extension papers for DC Tops cabs had been filed and were ready to be picked up.

18.     Upon arriving, Abadi discovered that Gleike had obtained extension for only about 90 of the approximately 357 drivers who had filled out the forms.  Berthone assured Abadi the installations would begin on September 2, and that he was talking to a company called National Auto Care and would have them trained in time to have all of the installations completed by September 30.

19.     After Abadi complained to Mr. Chrappah at the DCTC about Gleike's lack of compliance and responsiveness, Berthone called Abadi on August 31 to pick up extension papers for additional drivers.  Abadi asked why Gleike had obtained extension papers for less than half of the drivers who had filled out the paperwork, and when the drivers without the extension papers would receive installations, as they could no longer legally operate.  Berthone provided no substantive response.

20.     With still not a single installation scheduled for its hundreds of drivers, Abadi sought to locate Berthone in person, finding him on September 1 or 2 at location called Classic Cab.  Abadi asked Berthone asked what DC Tops should do with the drivers who had received extensions by getting scheduled installation dates with Gleike, as well as what the majority of drivers for whom Gleike had failed to obtain extensions should do. Berthone provided no scheduling information, and instructed Abadi to tell all the drivers without extension papers to stay home because they could not legally operate without an MTS, and that drivers could expect to be unemployed for three days.

21.     Solomon then emailed Berthone on September 2, expressing great concern that Gleike's failure to perform would adversely impact the livelihoods of hundreds of drivers.

22.     Gleike then terminated the Agreement on September 6, citing DC Tops's failure to pay fees under the Agreement.

23.     Challenger's experience with Gleike was similar to DC Tops'.  After signing the Agreement on August 13, Gleike on August 30 provided Challenger with an incomplete installation schedule for its drivers, with no indication of where the installations were to be performed.

24.     Gleike did not obtain installation extensions for the vast majority of Challenger's drivers. The first scheduled installation was set for September 2, leaving almost all of Challenger's drivers with no way to operate legally pending the installations.

25.     On the first scheduled installation date, September 2, 33 Challenger cabs were to receive installations.  However, Berthone could not be located, and Challenger received no instruction as to where the installations were to take place.  Challenger sought to locate Berthone in person, and found him on September 3 at a location called District Cab Co.

26.     On September 4, Berthone told Challenger he would be unable to obtain extensions for its drivers and that he did not know how he would get their installations scheduled.

27.     On September 5, Berthone told Challenger to send its drivers to Classic Shop to obtain installations.  Upon their arrival, the owner instructed the drivers to leave, and stated Classic Shop would not install Gleike's equipment anymore.

28.     The next day, lacking any functioning meters of its own, Gleike arranged to "upgrade" four existing meters in Challenger cabs with Gleike's software.  However, all four MTS systems failed, leaving even those drivers still unable to work, and demonstrating that Gleike lacked both its own meters to install, or the ability to install software upgrades that would

- 19 -

be MTS compliant and allow the drivers to work.

29.     After that failure, Berthone promised Challenger that he would bring in technicians from Chicago, and that all of Challengers 237+ cabs would receive installations on September 7. The drivers arrived early that morning at Challenger's site and waited all day. Berthone showed up at 4:00 p.m., and stated he would be unable to conduct any installations.

30.     Challenger terminated the Agreement that day as a result of Gleike's utter non-performance.

## Gleike's Agreement With Grand

31.     Grand entered into an Agreement with Gleike on approximately August 12, 2013, for the purpose of complying with the credit card swipe system mandate by which Gleike would, as a PSP, provide and operate the MTS. By DCTC regulation, Gleike was obligated to install the MTSs itself, and that was the parties' understanding at the time of the Agreement, and Gleike agreed to provide separate driver installation contracts for each driver who would receive an MTS under the Agreement

32.     Gleike did not send Grand an invoice for its equipment, and made no request for payment.

33.     Gleike applied for, and DCTC granted, an extension to Gleike to install the system in Grand's approximately 650 cabs between September 15 and September 30, 2013. Although DCTC regulations required the PSPs, such as Gleike, to apply for the extensions, Gleike lacked the personnel to do so and required Grand to provide the personnel, supplies, notaries, and distribution to Gleike for that purpose, for which Grand expended approximately $19,000.00.

34.     At the time of the Agreement, the parties understood that drivers would provide

their old meters to Gleike, to be replaced with Gleike's meters. If the drivers elected, Gleike would then modify the old meter (which was superior in several respects to Gleike's meter) to make it MTS compliant, and then switch it back out within 90 days. At all times, it was understood that Gleike would receive the old meters only as it replaced them with new ones, as the drivers could not operate without a meter. In anticipation of having the new system installed, on approximately September 10, 2013, approximately 47 Grand cabs turned in their meters to have them replaced with the Gleike system.

35.     Both because of the DCTC regulation requiring that Gleike be the MTS installer, and because Grand lacked the technical capacity to install the MTS in its drivers' cars, Grand agreed to pay Gleike an additional fee of $50 per car for the installation pursuant to separate agreements with each driver.

36.     On approximately September 10, 2013, Gleike informed Grand it would not proceed with the installations until Grand paid a Required Device Fee of $230.00 per cab, and an installation charge of $50.00 per cab. With 650 cabs, Gleike was demanding $182,000.00 from Grand.

37.     Gleike also refused to return the 47 meters that had been provided to it so that the MTS could be installed, the value of which was $9400.

38.     At the DCTC's behest, Grand paid Gleike the $182,000.00 on September 13, 2013.

39.     Between September 15 and September 19, 2013, Gleike installed the system in approximately 80 Grand cabs, an installation rate far below what was required to have all of Grand's 650 cabs compliant by the September 30, 2013 deadline. Under the schedule Gleike agreed to with DCTC and Grand, it had to average 50 installations a day. Gleike's actual

installation rate was 16 meters a day. Hundreds of Grand drivers showed up on their scheduled installation days, and Gleike either had no meters to install, or had no one to install them, forcing the drivers to leave, leaving them unable to operate without a compliant meter installed on the date set by DCTC.

40. During the brief period these 80 systems were installed and made operable by leike, approximately 75 failed to function properly, causing the drivers to be unpaid by their customers who used credit cards.

41. On September 19, 2013, at 10:52 EST, Gleike informed Grand it was terminating the Agreement.

42. On September 20, 2013, Grand and Gleike met with DCTC about Gleike's refusal to install the system. Gleike informed DCTC that it had terminated the Agreement with Grand, and intended to sue Grand.

43. DCTC instructed Gleike to enter into individual contracts with Grand's drivers, and use the $182,000.00 payment to pay their equipment and installation fees, and using the identical contract terms as under the Agreement.

44. Pursuant to DCTC's instructions, Grand's drivers sought to obtain their installations directly from Gleike. Contrary to DCTC's instructions, however, Gleike attempted to make the drivers sign an entirely different contract with new terms.

45. The Grand drivers refused to sign the new contract, and Gleike refused to install the system.

46. In addition to retaining the approximately 47 meters from the cabs it was going to replace, Gleike also shut down the meters on the approximately 80 cabs for which it installed the system.

- 22 -

47. Despite having utterly failed to perform under the Agreement, Gleike has retained Grand's $182,000.00.

**Gleike's Comprehensive Non-Performance of its Legal Obligations in D.C.**

48. Gleike repeated the aforedescribed conduct with virtually every D.C. cab company it contracted with, including Bay Cab, Merit Cab, Holiday Cab, Pan Am, and Imperial Cab.

49. In the few instances when Gleike actually performed installations, its equipment experienced a high failure rate.

50. Notwithstanding Gleike's claims of non-payment as the purported basis of its suits against DC Tops and Challenger, in the case of co-Defendants Grand Cab, the largest cab company in D.C., it was paid approximately $182,000.00, and still failed to conduct installations for more than 90% of the approximately 1000 cabs under the contract, and almost none of the installations it did perform resulted in functional, MTS-compliant meters.

51. On January 14, 2014, DCTC suspended Gleike's operating authority as a PSP for "failing to meet DCTC regulations," including "not making the required payment to their customers . . . and failing to provide required technical support to vehicle operators." Gleike's customers were ordered to transfer to DCTC-approved PSPs.

52. On information and belief, at no point did Gleike ever have the ability to provide and install functioning MTSs to D.C. cab companies.

53. On information and belief, Gleike could never have performed its Agreements with D.C. cab companies, and provided no consideration to the Counter-Plaintiffs in exchange for the fees it sought to charge. Its "damages" are no more than claims for fees for a product and service it was either unable, or unwilling, to provide.

54.     As a result of Gleike's failure to provide and install the meters, DC Tops' drivers lost approximately $221,400.000 as a result of being unable to work without an MTS-compliant system, as well as $6000.00 in tickets and $1050.00 in towing fees for drivers who sought to work without the MTSs Gleike had agreed to install.  DC Tops suffered damages in excess of $170,000.00 from drivers who had agreed to affiliate with DC Tops to obtain its PSP/MTS services under the Gleike contract, and then left to affiliate with another company when Gleike failed to perform.

55.     As a result of Gleike's failure to provide and install the meters, Challenger's drivers lost approximately $319,950.00 as a result of being unable to work without an MTS-compliant system.

56.   As a result of Gleike's failure to provide and install the meters, Grand's 650 drivers lost an average of $120.00/day for an average of 17 days, for a total of $1,326,000.00.

### COUNTERCLAIM I
### (Breach of Contract—DC Tops & Challenger)

57.     Paragraphs 1-56 are incorporated by reference.

58.     Gleike had agreements with DC Tops, Challenger, and their affiliated drivers to provide and install MTS-compliant credit card swipe systems in their cabs.

59.     Gleike failed to install functioning MTSs in any of these cabs, or provide any PSP services under the agreements.

60.     Gleike's failure to provide installations according to the DCTC-mandated schedule to which it agreed cost DC Tops' and Challenger's drivers approximately $500,000.00 in lost income, and over $7000.00 in tickets and towing fees.

61.     As a result of Gleike's breach, DC Tops has been damaged in an amount in excess

- 24 -

of $170,000.00 for drivers who had to re-affiliate with other companies able to offer compliant MTS installations.

62. Gleike is in complete breach of the contracts with DC Tops, Challenger, and their affiliated drivers.

## COUNTERCLAIM II
### (Fraud—DC Tops, Challenger & Grand)

63. Paragraphs 1-56 are incorporated by reference.

64. Gleike entered into agreements with DC Tops, Challenger, Grand and their affiliated drivers to provide and install credit card swipe systems in their cabs despite knowing it had neither the equipment to perform those functions to DCTC's specifications, or the ability to install the system by the required deadline.

65. DC Tops, Challenger, Grand and their affiliated drivers would not have entered into the contracts with Gleike had they known of the falsity of Gleike's claims that it could provide legally-compliant equipment and installation by the September 30, 2013 deadline.

66. Gleike failed to provide those MTS-compliant installations on any of those cabs.

67. Gleike's failure to provide installations according to the DCTC-mandated schedule to which it agreed cost DC Tops', Challenger's and Grand's drivers approximately $1,900,000.00 in lost income, $182,000.00 in falsely obtained equipment and installation fees, $9400.00 worth of meters, $19,0000.00 in installation costs, and in excess of $7000.00 in tickets and towing fees.

68. As a result of Gleike's fraud, DC Tops has been damaged in an amount in excess of $170,000.00 for drivers who had to re-affiliate with other companies able to offer compliant MTS installations.

- 25 -

**COUNTERCLAIM III**
**(D.C. Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.***
**—DC Tops, Challenger, and Grand)**

69.     Paragraphs 1-56 are incorporated by reference.

70.     DC Tops, Challenger, Grand and their affiliated drivers are "consumers," and Gleike is a "person," as defined under D.C. Code § 28-3901.

71.     Gleike entered into agreements with DC Tops, Challenger, Grand and their affiliated drivers to provide and install credit card swipe systems in their cabs despite knowing it had neither the equipment to perform those functions to DCTC's specifications, or the ability to install the system by the required deadline.  These acts and omissions were in violation of D.C. Code § 28-3904.

72.     DC Tops, Challenger, Grand and their affiliated drivers would not have entered into the contracts with Gleike had they known of the falsity of Gleike's claims that it could provide legally-compliant equipment and installation by the September 30, 2013 deadline.

73.     Gleike failed to provide those MTS-compliant installations on any of those cabs, except for approximately 5 Grand cabs.

74.     Gleike's failure to provide installations according to the DCTC-mandated schedule to which it agreed cost DC Tops', Challenger's and Grand's drivers approximately $1,900,000.00 in lost income, and in excess of $7000.00 in tickets and towing fees.

75.     As a result of Gleike's fraud, DC Tops has been damaged in an amount in excess of $170,000.00 for drivers who had to re-affiliate with other companies able to offer compliant MTS installations.

- 26 -

**COUNTERCLAIM IV**
**(Illinois Consumer Fraud & Deceptive Business Practices Act, § 815 ILCS 505/1,** *et seq.*
**--DC Tops, Challenger, and Grand.)**

76.    Paragraphs 1-56 are incorporated by reference.

77.    DC Tops, Challenger, Grand and their affiliated drivers are "consumers," and Gleike is a "person," as defined under § 815 ILCS 505/1.

78.    Gleike entered into agreements with DC Tops, Challenger, Grand, and their affiliated drivers to provide and install credit card swipe systems in their cabs despite knowing it had neither the equipment to perform those functions to DCTC's specifications, or the ability to install the system by the required deadline.  These acts and omissions were in violation of § 815 ILCS 505/2.

79.    DC Tops, Challenger, Grand and their affiliated drivers would not have entered into the contracts with Gleike had they known of the falsity of Gleike's claims that it could provide legally-compliant equipment and installation by the September 30, 2013 deadline.

80.    Gleike failed to provide those MTS-compliant installations on any of those cabs, except for approximately 5 for Grand's cabs.

81.    Gleike's failure to provide installations according to the DCTC-mandated schedule to which it agreed cost DC Tops', Challenger's and Grand's drivers approximately $1,900,000.00 in lost income, and in excess of $7000.00 in tickets and towing fees.

82.    As a result of Gleike's fraud, DC Tops has been damaged in an amount in excess of $170,000.00 for drivers who had to re-affiliate with other companies able to offer compliant MTS installations.

## COUNTERCLAIM V
### (Breach of Contract-Grand)

83. Paragraphs 1-56 are incorporated by reference.

84. Gleike had an agreement with Grand to provide and install credit card swipe systems in 650 Grand cabs.

85. Grand paid Gleike $182,000.00 for those installations.

86. Gleike failed to provide those installations on all but 80 cabs, the vast majority of those systems failed to perform, and Gleike intentionally rendered those 80 systems inoperable. Gleike also took 47 meters belonging to Grand without providing replacement meters with the card swipe system $9400.

87. Gleike failed to provide the personnel to apply for the installation extensions from DCTC, costing Grand $19,000.00.

88. Gleike's failure to provide installations according to the DCTC-mandated schedule to which it agreed cost Grand's drivers approximately $1,326,000.00 in lost income.

89. Gleike is in complete breach of the contract.

90. As a result of Gleike's breach, Grand has been damaged in an amount in excess of $182,000.00 in funds taken without consideration for the MTSs and installations, the loss of 47 meters valued at $9400, $19,000.00 to cover Grand's installation extension costs, and $1,326,000.00 in lost income

## COUNTERCLAIM VI
### (Unjust Enrichment-Grand)

91. Paragraphs 1-56 are incorporated by reference.

92. Gleike had an agreement with Grand to provide and install credit card swipe systems in 650 Grand cabs.

93.     Grand paid Gleike $182,000.00 for those installations.

94.     Gleike failed to provide those installations on all but 80 cabs, the vast majority of those systems failed to perform, and Gleike intentionally rendered those 80 systems inoperable. Gleike also took 47 meters belonging to Grand without providing replacement meters with the card swipe system $9400.00.

95.  Gleike failed to provide the personnel to apply for the installation extensions from DCTC, costing Grand $19,000.00.

96.     Gleike's has unjustly benefitted by these actions to Grand's detriment, and Gleike's retention of these benefits violates fundamental principles of justice, equity, and good conscience.

97.     As a result of Gleike's unjust enrichment, Grand has been damaged in an amount in excess of $182,000.00 in funds taken without consideration for the MTSs and installations, the loss of 47 meters valued at $9400.00, and $19,000.00 to cover Grand's installation extension costs.

WHEREFORE, Defendant/Counter-Plaintiffs DC Tops, Challenger, and Grand requests judgment in their favor and against Plaintiff/Counter-Defendant Gleike Taxi, Inc., and that DC Tops and Challenger be awarded compensatory, treble, and punitive damages, attorneys fees, interest, and such other legal and equitable relief as the Court deems proper.

Respectfully submitted,


BY:     _____/s/_____
        Patricia A. Bronte
        Stowell & Friedman, Ltd.
        303 W. Madison St., Suite 2600
        Chicago, IL 60606
        (o) 312-431-0888

- 29 -

pbronte@sfltd.com

Earl "Trey" Mayfield (admitted *pro hoc vice*)
tmayfield@lewis-firm.com
Michael Lewis (admitted *pro hoc vice*)
mlewis@lewis-firm.com
The Lewis Firm PLLC
901 New York Ave., NW, #450E
Washington, DC 20001
Tel: (202) 340-6257
Fax: (888) 630-6257
*Counsel for Defendants/Counter-Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on May 12, 2014, a true and complete copy of the foregoing Amended

Answer to Plaintiff's Second Amended Complaint, Affirmative Defenses & Counterclaims was

served by electronic case filing upon the following:

Svetlana Kaplina
skaplina@elanlawgroup.com
Helena Milman
hmilman@elanlawgroup.com
Elan Law Group
73 W. Monroe
Chicago, Il 60603
(o) 312-772-5672
(x) 312-284-5551


_____/s_____
THE LEWIS FIRM PLLC
Earl "Trey" Mayfield
Michael P. Lewis
901 New York Avenue NW
Suite 450 East
Washington, DC 20001
Tel: (202) 630-6257
Fax: (888) 430-6695
mlewis@lewis-firm.com
*Counsel for Defendant*

- 30 -