UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GLEIKE TAXI INC., <br><br> Plaintiff, <br><br> v. <br><br> DC TOPS LLC d/b/a DIAMOND CAB, CHALLENGER CAB LLC d/b/a CAMEL CAB and WONDER CAB, SIUM GHIRMAI, BERHE AINALEM, GRAND CAB LLC and TSEGAYE KEBEDE, <br><br> Defendants. | Case No. 13-cv-06715 <br><br> Judge Manish S. Shah |

## MEMORANDUM OPINION AND ORDER

In May 2013, the District of Columbia Taxicab Commission enacted regulations requiring all taxis be equipped with "Modern Taximeter Systems"—electronic meters and systems for processing credit-card payments. Plaintiff Gleike Taxi, Inc., makes MTS units; defendants DC Tops, LLC, Challenger Cab, LLC, and Grand Cab LLC are taxi companies that contracted with Gleike for the provision and installation of such units. The relationships broke down and Gleike sued the taxi companies, under breach-of-contract and other state-law theories. Defendants[1]

---

[1] In this opinion, "defendants" refers to DC Tops, Challenger, and Grand. The complaint also names as defendants the following individuals: Sium Ghirmai, Berhe Ainalem, and Tsegaye Kebede. [51] ¶¶ 5–6, 8. The complaint does not say how these individuals were involved, if at all, in the events giving rise to this suit. These individuals are represented by counsel and have answered the complaint (jointly, with the taxi company defendants).

counterclaimed, also under breach-of-contract and other state-law theories.[2] Defendants also pleaded numerous affirmative defenses. Gleike moves to dismiss certain counterclaims and strike certain affirmative defenses. As detailed below, Gleike's motions are granted in part and denied in part.

I.  **Legal Standards**

Gleike moves to dismiss certain counterclaims, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. When considering such a motion, a court must accept all well-pleaded allegations in the counterclaim as true and draw all reasonable inferences in favor of the counterclaim plaintiff. *Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001); *see also Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 405 (7th Cir. 2005). To survive Gleike's motion, the counterclaim must "state a claim to relief that is plausible on its face." *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads

---

[2] This court has jurisdiction based on the parties' diverse citizenship. [51, 53 (answer)] ¶¶ 1–8. Specifically: (1) Gleike is an Illinois corporation that has its principal place of business in Illinois, [51, 53 (answer)] ¶ 2; (2) DC Tops is a limited liability company organized under the laws of the District of Columbia, the two members of which are individuals domiciled in Virginia and the District of Columbia, [51, 53 (answer)] ¶ 3; (3) Challenger is a limited liability company organized under the laws of the District of Columbia, the 229 members of which are individuals domiciled in Maryland, Virginia, and the District of Columbia, [51, 53 (answer)] ¶ 4; (4) Grand is a limited liability company organized under the laws of the District of Columbia, the more than 200 members of which are individuals domiciled in Maryland, Virginia, and the District of Columbia, [51, 53 (answer)] ¶ 7; (5) Sium Ghirmai is an individual domiciled in Virginia, [51, 53 (answer)] ¶ 5; (6) Berhe Ainalem is an individual domiciled in Maryland, [51, 53 (answer)] ¶ 6; and (7) Tsegaye Kebede is an individual domiciled in Maryland, [51, 53 (answer)] ¶ 8.

Defendants have not raised any objection to venue. The parties' agreements contain forum-selection clauses, which specify that suits concerning the agreements shall be brought in Chicago. [51, 53 (answer)] ¶ 9; [51-1] at 5.

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Yeftich*, 722 F.3d at 915 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Gleike also moves to strike certain affirmative defenses. Motions to strike are "disfavored" because they "potentially serve only to delay." *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989). But where such motions "remove unnecessary clutter from the case, they serve to expedite, not delay." *Id*. Even then, "[a]ffirmative defenses will be stricken only when they are insufficient on the face of the pleadings. Ordinarily, defenses will not be struck if they are sufficient as a matter of law or if they present questions of law or fact." *Id*. (internal citation omitted). The decision to strike under Rule 12(f) is a discretionary one. *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1141–42 (7th Cir. 2009); Fed.R.Civ.P. 12(f) (stating that the court "may" strike certain matter from pleadings).

## II. Factual Allegations

### A. Industry Background

In May 2013, the District of Columbia Taxicab Commission enacted regulations requiring all taxis be equipped with a complete technology system, known as a "Modern Taximeter System" or "MTS." [51] ¶ 21. An MTS unit includes a taxi meter and a system for processing payments from credit and debit cards. [51] ¶ 21; [53] (counterclaims) ¶ 6. Taxis complied with the regulations only if a Commission-approved vendor provided the MTS unit. [51] ¶ 22; [53] (counterclaims)

3

¶ 6. Gleike was an approved vendor. [51] ¶ 39; [53] (counterclaims) ¶ 7. DC Tops, Challenger, and Grand are taxi companies that operate in D.C. [51] ¶10.

Initially, the regulations prohibited operation of a taxi beyond September 1, 2013, unless the taxi was equipped with an MTS. [51] ¶ 32; [53] (counterclaims) ¶ 6. On August 9, the Commission decided to allow individual extensions of the deadline. [51] ¶¶ 33–36. Only approved MTS-vendors could apply for extensions—taxi companies and individual drivers could not. [51] ¶35. Further, MTS-vendors could only apply for an extension on behalf of a driver if, by August 15, they had signed a contract to install the driver's MTS unit. [51] ¶ 34; *see also* [53] (counterclaims) ¶ 6. Extension applications were due August 15. [51] ¶ 37.

### B. Gleike's Allegations

#### 1. Gleike's Agreements with DC Tops and Challenger

In August 2013, DC Tops and Challenger contacted Gleike about MTS units for their drivers. [51] ¶ 38. On or about August 13, DC Tops and Challenger executed separate (but nearly-identical) agreements with Gleike. [51] ¶ 40. Gleike alleges that neither DC Tops nor Challenger had any intention of performing its obligations under its contract—they signed them solely to qualify for extensions of the regulatory deadline. [51] ¶¶ 41–42; *see also* [51] ¶¶ 43–48. Gleike says that it expended significant resources toward completing the projects. [51] ¶¶ 49–60. But on or about September 7, without justification, Challenger terminated its agreement. [51] ¶¶ 61–63.

### 2. Gleike's Agreement with Grand

On or about August 12, 2013, Grand and Gleike signed a contract concerning MTS units. [51] ¶ 64. At the time, there were approximately 650 drivers working for Grand. [51] ¶ 65. The agreement required Gleike to provide at least 650 MTS units, and required Grand to pay $230 per unit (due upon signing). [51] ¶¶ 66–67. Gleike was also to receive a percentage of all credit card payments processed through the MTS. [51] ¶ 67. Grand was required to turn over to Gleike all of the old, pre-existing meters from the individual taxis. [51] ¶ 68. Initially, the parties agreed that Grand would install the MTS units, but they later agreed that Gleike, working with third-party installers, would do so, for an additional $50 per car. [51] ¶ 69.

Grand publicly announced that MTS units would be installed in its taxis at no upfront cost to drivers. [51] ¶ 70. As a result, within a few days, Grand had attracted about 500 additional drivers. [51] ¶ 71. Accordingly, Grand and Gleike agreed that MTS units would be installed in 1,162 taxis. [51] ¶ 72.

Installations began around September 15 and continued through September 19. [51] ¶ 80. The installation process was fraught with problems. First, Grand reneged on its promise to drivers not to charge installation fees: Grand collected $280 from each driver. [51] ¶ 78. Though it wasn't true, Grand justified this change by telling drivers that Gleike had altered its agreement with Grand at the last minute. [51] ¶¶ 74–76, 79. Additionally, Grand did not inform drivers that they were required to turn over their old meters, so many refused to do so. [51] ¶ 82. Finally, Grand had misrepresented to drivers certain aspects of Grand's agreement with Gleike, causing the drivers to become angry when their expectations were not

5

met. [51] ¶¶ 81–86. Drivers blamed Gleike, causing chaos at the installation site (including threats of violence). [51] ¶¶ 87–92. Around September 19, having received only partial payment, and considering the chaos caused by Grand's misrepresentations, Gleike terminated the agreement. [51] ¶¶ 77, 93.

Grand and Gleike met with the D.C. Taxicab Commission, and Gleike stated that it intended to contact drivers who did not have contracts with other providers, to offer them Gleike's MTS. [51] ¶¶ 96–97. Grand then sent emails to many of those drivers, urging them not to work with Gleike. [51] ¶ 98. Then, on a public conference call, members of Grand's board of directors made false statements injurious to Gleike's reputation, including that more than 650 drivers lost income because Gleike did not do its job. [51] ¶ 100.

### C. Defendants' Allegations

#### 1. Gleike's Agreement with DC Tops

Around August 8, 2013, needing an MTS solution, DC Tops sought guidance from the D.C. Taxicab Commission's Chief of Operations. [53] (counterclaims) ¶ 8. He strongly recommended Gleike, saying that Gleike was an approved vendor that could meet the regulatory deadline. [53] (counterclaims) ¶ 8. Gleike assured DC Tops that Gleike would apply for the extensions, that installations would begin on August 16, and that Gleike could complete the installations by the (extended) deadline. [53] (counterclaims) ¶ 13. On August 12, DC Tops and Gleike signed their agreement. [53] (counterclaims) ¶ 9. Under the agreement, Gleike was to provide and operate the needed MTS units. [53] (counterclaims) ¶ 9. Gleike was to install

6

the units (for a $50 fee), and Gleike agreed to provide separate driver-installation contracts for each driver. [53] (counterclaims) ¶¶ 9–10.

Gleike applied for deadline extensions, but not for all of the drivers, so some became legally prohibited from operating their taxis. [53] (counterclaims) ¶¶ 17–20. Further, the installations did not begin on time because Gleike lacked sufficient personnel and installation sites. [53] (counterclaims) ¶¶ 13, 15–16, 18–20. After several unsuccessful attempts, DC Tops contacted Gleike on September 2, and expressed concern that Gleike's failure to perform would harm the livelihoods of many drivers. [53] (counterclaims) ¶¶ 15–16, 19–21. Gleike then terminated its agreement with DC Tops, citing DC Tops's failure to pay fees. [53] (counterclaims) ¶ 22. But Gleike had not previously requested payment or provided instructions as to how it was to be paid. [53] (counterclaims) ¶¶ 11, 13.

**2. Gleike's Agreement with Challenger**

Like DC Tops, Challenger was referred to Gleike by the D.C. Taxicab Commission's Chief of Operations. [53] (counterclaims) ¶ 8. Challenger learned from DC Tops that Gleike had represented that it would apply for the extensions, would begin installations on August 16, and could complete the installations by the extended deadline. [53] (counterclaims) ¶ 13. On August 13, 2013, Challenger and Gleike signed an agreement that was virtually identical to the one Gleike signed with DC Tops. [53] (counterclaims) ¶ 13.

On August 30, Gleike provided Challenger with an installation schedule, but it was incomplete and it gave no indication of where the installations would take place. [53] (counterclaims) ¶ 23. For the vast majority of Challenger's drivers,

7

Gleike did not obtain a deadline extension. [53] (counterclaims) ¶ 24. The first installation was scheduled for September 2—one day after the unextended deadline—so most of Challenger's drivers were legally prohibited from operating their taxis for a period of time. [53] (counterclaims) ¶ 24. Due to Gleike's lack of ability, the installations never went forward. [53] (counterclaims) ¶¶ 25–29. On September 7, due to Gleike's non-performance, Challenger terminated the agreement. [53] (counterclaims) ¶ 30.

### 3. Gleike's Agreement with Grand

Grand and Gleike signed their agreement around August 12, 2013. [53] (counterclaims) ¶ 31. Gleike was to install the MTS units (for a $50 fee), and Gleike agreed to provide separate driver-installation contracts for each driver. [53] (counterclaims) ¶¶ 31, 35. Although Gleike was required to apply for the deadline extensions, it lacked the resources to do so. [53] (counterclaims) ¶ 33. Grand therefore provided resources (such as personnel and supplies), spending about $19,000. [53] (counterclaims) ¶ 33. Using Grand's resources, Gleike applied for and received extensions for about 650 of Grand's drivers. [53] (counterclaims) ¶ 33.

Gleike and Grand understood that drivers would provide their old meters to Gleike, to be replaced with Gleike's meters. [53] (counterclaims) ¶ 34. Because drivers could not operate without a meter, Gleike was to receive the old meters only as it replaced them with new ones. [53] (counterclaims) ¶ 34. In many ways, Grand's old meters were superior to Gleike's. [53] (counterclaims) ¶ 34. Thus, drivers were given the option of having their old meters reinstalled after Gleike updated them to be MTS-compliant. [53] (counterclaims) ¶ 34.

Around September 10, in anticipation of having MTS units installed, about 47 Grand drivers gave their old meters to Gleike. [53] (counterclaims) ¶ 34. Also around September 10, Gleike informed Grand that it would not proceed with installations until Grand paid $280 per taxi—$230 for the MTS unit and $50 for installation. [53] (counterclaims) ¶ 36. For Grand's 650 taxis, Gleike therefore demanded $182,000. [53] (counterclaims) ¶ 35. Further, Gleike refused to return the 47 old meters that Grand drivers had turned in (the value of which was $9,400). [53] (counterclaims) ¶ 37. On September 13, Grand paid Gleike $182,000. [53] (counterclaims) ¶ 38.

Between September 15 and 19, Gleike installed its MTS in approximately 80 Grand taxis—an installation rate far below what was required to meet the deadline. [53] (counterclaims) ¶ 39. Of those 80 units, about 75 failed to work properly (when customers used credit cards, the drivers did not get paid). [53] (counterclaims) ¶ 40. Further, hundreds of Grand drivers showed up on their scheduled installation days, but Gleike was unable to complete the installations, forcing the drivers to leave, and leaving them unable to legally operate their taxis. [53] (counterclaims) ¶ 39.

On September 19, Gleike terminated the agreement. [53] (counterclaims) ¶ 41. Gleike shut down the 80 MTS units it had installed. [53] (counterclaims) ¶ 46. On September 20, Gleike and Grand met with the D.C. Taxicab Commission, and Gleike reported that it had terminated the agreement and intended to sue Grand. [53] (counterclaims) ¶ 42. The Commission instructed Gleike to sign individual contracts with Grand's drivers (with terms identical to those from the Grand-Gleike

agreement), and to install MTS units in the drivers' taxis, using the $182,000 that Grand had paid. [53] (counterclaims) ¶ 43. But when the drivers showed up for their installations, Gleike tried to make them sign contracts with very different terms. [53] (counterclaims) ¶ 44. The drivers refused, and Gleike refused to perform the installations. [53] (counterclaims) ¶ 45. Gleike has not returned the $182,000 payment it received from Grand. [53] (counterclaims) ¶ 47.

### 4. Gleike's Failures, in General

Defendants allege that, at all relevant times, Gleike lacked the ability to install functioning MTS units. [53] (counterclaims) ¶¶ 52–53. As a result of Gleike's failures, drivers switched to other taxi companies, causing defendants to lose money. [53] (counterclaims) ¶ 54. Also, defendants' drivers lost money because they were unable to work, or because they attempted to work but were fined for doing so without functioning MTS units.[3] [53] (counterclaims) ¶¶ 54–56.

## III. Analysis

Gleike sued defendants for breach of contract, fraud, tortious interference with a prospective business expectancy, and defamation. Defendants counterclaimed for breach of contract, fraud, violations of the D.C. Consumer Protection Procedures Act, violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, and unjust enrichment. [53] (counterclaims) ¶¶ 57–97.

---

[3] The defendant taxi companies purport to bring counterclaims both on their own behalf, and on behalf of their affiliated drivers, who are alleged to have assigned their rights to the taxi companies. [53] (counterclaims) ¶¶ 1–3.

Gleike moves to dismiss the counterclaim brought under the D.C. consumer-protection statute and the counterclaim for unjust enrichment.

Defendants raised 10 affirmative defenses. [53] (answer) ¶¶ 118–27. Of those 10, Gleike moves to strike the defenses of (1) unclean hands; (2) failure to state a claim; (3) estoppel; and (4) frustration of purpose.

Finally, Gleike moves to strike defendants' jury demand.

### A. Counterclaim Under the D.C. Consumer Protection Procedures Act

The D.C. Consumer Protection Procedures Act applies to transactions involving goods that "[a] person does or would purchase, lease (as lessee), or receive and normally use for personal, household, or family purposes . . . ." D.C. CODE § 28-3901(a)(2)(B)(i). The statute "was designed to police trade practices arising only out of consumer-merchant relationships . . . and does not apply to commercial dealings outside the consumer sphere." *Julian Ford v. ChartOne, Inc.*, 908 A.2d 72, 81 (D.C. 2006) (internal citation omitted). Gleike argues that "the transaction at issue in this case is not [a] consumer transaction within the meaning" of the statute. [54] at 2. Because this is an issue of state law, the interpretation of the statute by the District of Columbia Court of Appeals controls. *James Michael Leasing Co. LLC v. Paccar, Inc.*, 772 F.3d 815, 2014 U.S. App. LEXIS 22410, *13 (7th Cir. Nov. 26, 2014).

In arguing that the taxi drivers' purchase of MTS units is covered by the statute, defendants rely on *Adam A. Weschler & Son, Inc. v. Klank*, 561 A.2d 1003 (D.C. 1989), a case in which an individual bought an antique chest at auction. Defendants rely on the following passage:

> [I]t is not the use to which the purchaser ultimately puts the goods or services, but rather the nature of the purchaser that determines the nature of the transaction. If the purchaser is regularly engaged in the business of buying the goods or service in question for later resale to another in the distribution chain, or at retail to the general public, then a transaction in the course of that business is not within the Act. *If, on the other hand, the purchaser is not engaged in the regular business of purchasing this type of goods or service and reselling it, then the transaction will usually fall within the Act.*

*Id.* at 1005 (emphasis added). In *Julian Ford*, the D.C. Court of Appeals quoted this language and wrote that *Klank* had "essentially settled the question of how to determine whether a transaction is a consumer transaction" covered by the statute. *Julian Ford*, 908 A.2d at 83. Accordingly, defendants argue that because the taxi drivers intended to use the MTS units, rather than resell them, the transaction is covered. [60] at 3. There is some superficial appeal to this point, but *Klank* "did not set forth an ironclad rule; it said only that if the purchaser is not engaged in the regular business of buying and reselling the goods in question, the transaction will 'usually' be subject to the CPPA, not that it always will be." *Julian Ford*, 908 A.2d at 84 n.12.[4]

Ultimately, if the purpose for a good (even by an end-user) is a business or professional one, then the transaction is exempt from D.C.'s consumer-protection law. The statute "does not protect merchants in their commercial dealings with suppliers or other merchants." *Julian Ford*, 908 A.2d at 81, 83. As the United

---

[4] The *Klank* court itself noted that there was no evidence that plaintiff intended to use the chest for commercial purposes, and thus it was "entirely conceivable that Klank intended to make personal use of this antique chest in his home or office. . . . [S]uch use falls squarely within the broad 'personal, household or family use' definition given by the Act." *Klank*, 561 A.2d at 1004.

12

States Court of Appeals for the District of Columbia Circuit concluded, "the statute does not reach transactions intended primarily to promote business or professional interests." *Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1043 (D.C. Cir. 2010). Other courts have similarly found transactions that primarily promoted business interests to be outside the scope of the consumer-protection statute. *See, e.g.*, *Bakeir v. Capital City Mortg. Corp.*, 926 F.Supp.2d 320, 333 (D.D.C. 2013) (purchasing property solely for investment purposes). "A purchase of supplies or equipment for a business operation, for example, might be exempt even though such goods would not be resold." *Julian Ford*, 908 A.2d at 84 n.12 (citing *Mazanderan v. Indep. Taxi Owners' Ass'n, Inc.*, 700 F.Supp. 588, 591 (D.D.C. 1988) (taxicab operator's purchase of gasoline and supplies was not a consumer transaction within the coverage of the CPPA). Finally, the D.C. Court of Appeals again emphasized the distinction between personal and business use in *Modern Mgmt. Co. v. Wilson*, 997 A.2d 37 (D.C. 2010). There, the court found that the statute applied to a transaction because it was personal to the plaintiff. *Id.* at 63.

The transactions in this case are business, not personal: The MTS units are put exclusively to business use by taxi drivers and taxi companies. Therefore the transactions in this case are outside the scope of the D.C. Consumer Protection Procedures Act. Gleike's motion to dismiss that counterclaim is granted.

### B. Counterclaim for Unjust Enrichment

Gleike moves to dismiss Grand's counterclaim for unjust enrichment, arguing that "the relationship between Gleike and Grand was governed by an [a]greement" and "where there is a specific contract which governs the relationship of the parties,

13

the doctrine of unjust enrichment has no application." [54] at 4. Grand responds that the unjust-enrichment claim is "in the alternative" to its claim for breach of contract. [60] at 4. Gleike recognizes that pleading in the alternative is permissible but argues, citing *Holman v. Indiana*, 211 F.3d 399, 407 (7th Cir. 2000), that Grand has not done so here. [67] at 3. Gleike's reliance on *Holman* is misplaced. In that case, the Seventh Circuit rejected the plaintiff's argument that it had pleaded a legal theory "in the alternative" where that theory was inconsistent with the plaintiff's factual allegations. *Id.* at 405–07. Here, Grand's alternative claim for unjust enrichment does not contradict any of its factual allegations, including those it lodges in support of its claim for breach of contract.[5] Gleike's motion to dismiss the unjust-enrichment counterclaim is denied.

**C. Affirmative Defense of Unclean Hands**

Gleike moves to strike the affirmative defense of unclean hands, arguing that unclean hands "is a defense to an action for equitable relief" that "does not apply to a claim for monetary relief." [56] at 2–3. The Seventh Circuit has previously noted that there is "a long tradition of applying equitable defenses in cases at law" and that "with the merger of law and equity (Fed.R.Civ.P. 2) there is no longer a good reason to distinguish between the legal and equitable character of defenses . . . ."

---

[5] In its reply brief, Gleike argues that the unjust-enrichment claim fails because Grand "incorporated" allegations that also concern its breach-of-contract claim, and because no party has argued that the Gleike-Grand agreement is invalid. [60] at 3–4. Because this argument was raised for the first time in Gleike's reply brief, Grand did not have an opportunity to respond, and the argument is waived. *E.g.*, *Darif v. Holder*, 739 F.3d 329, 336–37 (7th Cir. 2014). In any event, Grand *does* argue that the agreement was invalid, because Gleike induced its execution through fraud. [53] (counterclaims) ¶¶ 64–65.

14

*Maksym v. Loesch*, 937 F.2d 1237, 1248 (7th Cir. 1991). But the court recognized that when Illinois law controls, as it does here, the view of the Illinois state courts controls. *Id*. And Gleike is correct that under Illinois law, unclean hands is unavailable as a defense where the plaintiff seeks only legal remedies. *Zahl v. Krupa*, 365 Ill.App.3d 653, 658 (2d Dist. 2006) ("[T]he unclean hands doctrine bars only equitable remedies and does not affect legal rights"); *Am. Nat'l Bank & Trust Co. v. Levy*, 83 Ill.App.3d 933, 936 (1st Dist. 1980); *Gen. Elec. Bus. Fin. Servs., Inc. v. Silverman*, 693 F.Supp.2d 796, 804 (N.D. Ill. 2010); *RBS Citizens, N.A. v. Sanyou Import, Inc.*, 2011 WL 2712744, *4 (N.D. Ill. 2011); *HSBC Mortg. Servs., Inc. v. Equisouth Mortg., Inc.*, 2011 WL 529412, *3 (N.D. Ill. 2011). Gleike's motion to strike the affirmative defense of unclean hands is granted.[6]

### D. Affirmative Defense of Failure to State a Claim

As an affirmative defense, defendants pleaded that Gleike failed to allege that it sufficiently performed its own obligations under the agreements, and thus failed to state a claim for breach of contract. [53] (answer) ¶ 122.[7] Gleike moves to strike that defense, arguing that it "specifically pleaded in the Complaint that it commenced performance, having calibrated approximately 1,100 MTS units with taxicab specifications, and registered 1,100 taxicabs on Gleike's portal." [56] at 3. The parties dispute whether those alleged actions show that Gleike was ready, able,

---

[6] The conduct that underlies an accusation of unclean hands may still be relevant to the calculation of damages sought by the plaintiff.

[7] Gleike concedes that failure to state a claim is an acceptable affirmative defense in this district. [56] at 3.

and willing to perform its obligations when defendants breached or repudiated the agreements, or made Gleike's performance impossible. [59] at 2–3; [68] at 2–3.

The affirmative defense is not mere clutter. Whether Gleike performed its obligations, or would have done so but for defendants' conduct, is a question properly raised by the pleadings. But deciding the question requires further factual development and argument (the parties' briefing on the issue totals just six paragraphs). *See Heller Fin.*, 883 F.2d at 1294 ("Ordinarily, defenses will not be struck . . . if they present questions of law or fact."). Gleike's motion to strike the defense of failure to state a claim is denied.

### E. Affirmative Defense of Estoppel

Gleike argues that defendants have not adequately pleaded their affirmative defense of estoppel. "[T]he party claiming estoppel must demonstrate that: (1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other person intended or reasonably expected that the party claiming estoppel would act upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof." *In re Marriage of Mancine*, 380 Ill.Dec. 879, 895–96 (1st Dist. 2014).

In their pleading and response brief, defendants make clear that the alleged misrepresentations they rely on are Gleike's representations that it was able and willing to provide and install functional MTS units by the D.C. Taxicab Commission's deadline. [53] (answer) ¶ 123; [59] at 3. Defendants' theory is that those representations were material to defendants' decision to contract with Gleike (and therefore stop looking for other potential providers for an MTS solution), and that Gleike knew all along that the representations were false. That defense is perhaps duplicative of defendants' fraud-in-the-inducement defense—which Gleike has not moved to strike—but it is not mere clutter. Gleike's motion to strike the defense of estoppel is denied.

### F. Affirmative Defense of Frustration of Purpose

Defendants pleaded the affirmative defense of frustration of purpose. That doctrine applies "if a party's performance under the contract is rendered meaningless due to an unforeseen change in circumstances." *Illinois-American Water Co. v. City of Peoria*, 332 Ill.App.3d 1098, 1106 (3d Dist. 2002). In order to apply the doctrine, "there must be a frustrating event not reasonably foreseeable and the value of the parties' performance must be totally or almost totally destroyed by the frustrating cause." *Id*. Gleike argues that defendants have not adequately pleaded this defense, and I agree. Defendants argue that the "frustrating event" was "Gleike's failure to timely provide and install functional meters." [59] at 4. That is not a "frustrating event"—it is the what defendants contend constitutes Gleike's breach. Further, nothing "totally or almost totally destroyed" the value of Gleike's performance. Defendants at all times—even after their relationship with Gleike

17

deteriorated—wanted functioning MTS units, so the value of performance was not destroyed. The doctrine of frustration of purpose does not apply here, so Gleike's motion is granted.

### G. Jury Demand

A jury waiver in a written agreement is enforceable and is interpreted like any other contract provision (no extra evidence of negotiation or consent is required). *IFC Credit Corp. v. United Bus. & Indus. Fed. Credit Union*, 512 F.3d 989, 993–94 (7th Cir. 2008). Gleike moves to strike the defendants' jury demand because each defendant signed a written agreement that contained a jury waiver. Specifically, as defendants concede, the agreements stated that the parties "irrevocably waive any and all rights they may have to a jury in any judicial proceeding involving any claim relating to this Agreement." [59] at 4. The defendants acknowledge that waiver, but argue that some of the claims in this case don't relate to Gleike's agreements with the taxi companies (which contain the waivers), and those claims should be tried to a jury. The claims that defendants argue should be tried to a jury are: (1) Gleike's claim for tortious interference with a prospective business expectancy; and (2) the counterclaims that defendants bring on behalf of their drivers. [59] at 4.

Defendants' argument is unavailing. Their jury waiver was broad, encompassing *all* rights to trial by jury as long as the "judicial proceeding" involved *any* claim relating to the written agreement containing the jury waiver. This case is a judicial proceeding, and it involves claims relating to the written agreements

18

containing jury waivers. Defendants have therefore waived all rights to trial by jury.[8] Gleike's motion to strike the jury demand is granted.

## IV. Conclusion

For the foregoing reasons, Gleike's motions to dismiss [54] and to strike [56] are granted in part and denied in part, as follows:

- Defendants' counterclaim for violation of the D.C. Consumer Protection Procedures Act is dismissed;

- Grand's counterclaim for unjust enrichment is not dismissed;

- Defendants' affirmative defense of unclean hands is stricken;

- Defendants' affirmative defense of failure to state a claim is not stricken;

- Defendants' affirmative defense of estoppel is not stricken;

- Defendants' affirmative defense of frustration of purpose is stricken;

- Defendants' jury demand is stricken.

ENTER:

Manish S. Shah
United States District Judge

Date: 1/20/15

---

[8] Even if defendants had only waived their jury rights for claims *related to* the agreements between the taxi companies and Gleike (as opposed to all claims in the overall judicial proceeding), defendants' argument that the drivers' claims are unrelated is unpersuasive. Notably, the agreements with individual drivers referred to the agreement with the relevant taxi company, and each driver acknowledged having reviewed and being bound by his company's agreement with Gleike. *See* [68] at 5.