UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GLEIKE TAXI INC.,

        Plaintiff,

   v.

CHALLENGER CAB, LLC, et al.,

        Defendants.

No. 13 CV 6715

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

In May 2013, the District of Columbia Taxicab Commission enacted regulations requiring all taxicabs be equipped with "modern taximeter systems"—electronic meters and systems for processing credit card payments. Gleike Taxi Inc. was an approved provider of modern taximeters and credit card processing services. A few months later, Gleike and Challenger Cab, LLC (a cooperative of individual taxi drivers) entered into an agreement for Gleike to provide Challenger's drivers with the required systems and services. Shortly thereafter, the relationship between the parties broke down. Gleike sued Challenger and individuals Sium Ghirmai and Berhe Ainalem (personal guarantors of the agreement), bringing claims for breach of contract against all defendants and fraud against Challenger. [51].[1] Challenger, on its own behalf and as assignee of its affiliated drivers' rights against Gleike,

---

[1] Bracketed numbers refer to entries on the district court docket. Gleike's lawsuit against Challenger was originally filed under 1:13-cv-06716, but was consolidated under 1:13-cv-06715 with Gleike's similar lawsuits against other D.C. taxicab companies. Pursuant to stipulations, defendants/counter-claimants DC Tops LLC, Grand Cab LLC, and Tsegaye Kebede have been dismissed. [102], [127].

brought counterclaims against Gleike for breach of contract, fraud, and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2.[2] [53]. Gleike moves for summary judgment on Challenger's counterclaims. Challenger, Ghirmai, and Ainalem (collectively, Challenger) move for summary judgment on all of Gleike's claims.[3]

For the reasons stated below, Challenger's motion for summary judgment is granted and Gleike's motion for summary judgment is denied.

## I.    Background[4]

In May 2013, the District of Columbia Taxicab Commission amended its regulations to require taxicabs to have credit card compatible taximeters (called "modern taximeter systems" or MTSs) and credit card processing services. [119] ¶ 7. The rules required all D.C. taxicabs to have an operational modern taximeter system installed by September 1, 2013. *Id*. ¶ 9. After that date, cabs without a modern taximeter would be forbidden from operating—under penalty of towing, license suspension or revocation, or a $1,000 fine. *Id*.

---

[2] Challenger's counterclaim under the D.C. Consumer Protection Procedures Act was dismissed. [78].

[3] Jurisdiction exists under 28 U.S.C. § 1332(a)(1) because the parties are diverse—Gleike is an Illinois corporation, Challenger is a D.C. company, Ghirmai a Virginia resident and Ainalem a Maryland resident—and the amount in controversy exceeds $75,000. The parties' agreement also provided for venue in this district. [119] ¶¶ 1–6.

[4] The facts are taken largely from Challenger's response to Gleike's Local Rule 56.1 statement, [116], Gleike's response to Challenger's statement, [119], Gleike's response to Challenger's statement of additional facts, [121], and Challenger's response to Gleike's statement of additional facts, [123].

Two chapters under Title 31 of D.C.'s Municipal Regulations were updated: Chapter 4, "Taxicab Payment Service Providers," and Chapter 6, "Taxicab Parts & Equipment." [119] ¶¶ 7–8.[5] Under the D.C. regulations, only "payment service providers" approved by the Taxicab Commission could provide the modern taximeter systems and operate payment processing services. *Id.* ¶ 9. The regulations further required modern taximeter systems to be installed by an "authorized MTS installation business"—i.e., a Commission-approved installer. [123] ¶¶ 1–4; [112-9] at 11; [112-13] at 16.

In July 2013, the Taxicab Commission adopted emergency rules to "prevent[] legal incongruities" affecting implementation of the modern taximeter systems. These rules, in particular 31 DCMR §§ 401.7 and 603.2(f), extended the original September 1 installation deadline to September 30. [119] ¶ 10; [123] ¶¶ 8–9; [112-12]. This installation extension only applied, however, to taxicab companies (or their drivers) if: (1) they had signed a contract with an approved payment service provider by August 15, 2013; (2) that provider requested an extension on the cab company's (or driver's) behalf by August 15; and (3) the installation extension was approved by the Taxicab Commission. [119] ¶ 10; [112-12]. Taxicab companies were expressly forbidden from requesting extensions on their own; only payment service providers could request extensions on their behalf. [119] ¶ 10.

---

[5] The implementing regulations, rulemaking notices, and their effective dates are on the Commission's website: http://dcregs.dc.gov/Gateway/TitleHome.aspx?TitleNumber=31 (lasted visited April 13, 2016). [119] ¶ 7. The docket version of the notice of emergency rulemaking ([112-12]) is missing page 4 of the text, which is available at http://dcregs.dc.gov/Gateway/NoticeHome.aspx?NoticeID=4508092 (last visited April 13, 2016).

In August 2013, there were about seven approved providers in D.C., including Gleike Taxi Inc. [116] ¶ 7; [123] ¶ 17. Gleike is a subsidiary of Taximeter, LLC, whose owner is Patrice Berthome; Berthome was Gleike's representative to Challenger during the relevant events. [119] ¶ 1. Challenger Cab LLC is a taxicab company—specifically, a purchasing cooperative for its member taxi drivers—that operates in the greater D.C. area under the labels "Wonder Cab" and "Camel Cab." [116] ¶ 8; [119] ¶ 2. Most of Challenger's approximately 240 members are from Eritrea. The drivers own their own cabs but use Challenger to obtain insurance, for maintenance services and regulatory compliance, and to obtain new meters and payment processing services. [119] ¶ 2.

By late July 2013, Challenger made arrangements with approved provider VeriFone for modern taximeter units and credit card payment services. Around August 5th or 6th, Challenger learned that VeriFone had withdrawn from the D.C. market. [119] ¶ 15. Under pressure from the Taxicab Commission to comply with the September 1, 2013 installation deadline, Challenger sought guidance from the Commission's Chief of Operations, Ernest Chrappah. Chrappah strongly recommended that Challenger contact Gleike, stating that Gleike was both an approved provider and a modern taximeter vendor with the capacity to meet the September 1 installation deadline. Chrappah provided Challenger with Berthome's contact information. *Id.* ¶ 16.

Challenger entered into an agreement with Gleike on August 13, 2013. [116] ¶ 9; [119] ¶ 17. Sium Ghirmai and Bernie Ainalem were managers at Challenger

and signed the agreement as personal guarantors. [116] ¶ 10; [119] ¶¶ 3–4. Prior to executing the agreement, Gleike met with six to eight Challenger representatives on two separate occasions, and spent at least four hours going over the terms of the agreement. [123] ¶ 10. Gleike, however, was not aware of the specifics of the Taxicab Commission's emergency rules until after it signed the August 13 agreement with Challenger, although it did know that it would be applying to the Commission for installation extensions on behalf of Challenger's drivers. [119] ¶¶ 12, 28.

Under the August 13 agreement, Gleike would provide modern taximeter units and credit card processing services in at least 250 Challenger cabs. [116] ¶ 9; [119] ¶ 17. The parties intended to replace Challenger's existing meters with new Gleike meters (i.e., a Gleike taximeter, credit card swipe, and GPS receiver), but Gleike and Challenger later agreed that Gleike would instead upgrade Challenger's existing meters. [121] ¶ 32. The agreement stated that "[Gleike] shall provide to [Challenger] the Equipment, and [Challenger] shall install the Equipment in at least 250 taxicabs;" Gleike, however, eventually agreed to assume responsibility for installing the new meters. [121] ¶ 32; [112-1] at 3.[6] Both parties intended that the actual installation was to be performed by Commission-approved installers. [123] ¶ 13.

---

[6] The parties do not dispute that Gleike agreed to assume responsibility for installations, but argue over whether the language in the agreement was modified. [121] ¶ 32. The parties dispute whether the Commission regulations required Challenger or Gleike (as the approved provider) to be responsible for installing the modern taximeter. [119] ¶¶ 11, 18.

Although the agreement stated that on the date of execution (August 13), Challenger was to pay Gleike and turn over its old meters (or pay Gleike $300 per meter), Challenger had not paid or turned over its old meters by that date. [121] ¶ 32. Despite this, Gleike proceeded to order and program equipment, meet with meter shops and garages, and apply for installation extensions for Challenger's drivers. *Id*. The parties dispute, however, the number of drivers for which Gleike applied for extensions. Gleike claims that it submitted 232 extension requests on Challenger's behalf. [116] ¶ 14;[7] [119] ¶ 31. Challenger claims that Gleike failed to apply for extensions for more than 60 drivers. [119] ¶ 31.

Gleike also configured 237 modern taximeters with Challenger vehicle specifications and registered 237 Challenger vehicles on Gleike's web portal. Five days after execution of the agreement, Gleike purchased credit card readers from a third-party provider. [116] ¶¶ 16–18. Gleike also provided driver agreements to Challenger for Challenger's affiliated drivers receiving a modern taximeter. [119] ¶ 18; [121] ¶ 33. The driver agreements specified that affiliated drivers were to be bound only by the "Final User" provision of the agreement between Gleike and Challenger. [121] ¶ 33.

At some point after executing the August 13 agreement, Gleike and Challenger agreed that instead of replacing Challenger's existing taximeters with

---

[7] Challenger responds to this statement of fact (and others) with "Unknown," which is not an appropriate response under Local Rule 56.1(b)(3)(B). The response of "Unknown" means the fact is undisputed. With respect to the number of extension requests, Challenger does refer to another answer disputing the number of drivers for which Gleike actually applied for extensions. [116] ¶¶ 14–15.

Gleike's taximeters, Gleike would upgrade Challenger's taximeters into modern taximeters. [119] ¶ 36. Approximately 90–95% of Challenger's existing meters were Pulsar meters, and the rest were Centrodyne meters. *Id*. ¶ 37. Gleike ordered components from Pulsar for the upgrades. [116] ¶¶ 22–24.

Gleike also issued Commission-mandated extension letters to drivers, which included installation dates that Gleike had suggested in its extension applications on Challenger's behalf. [119] ¶ 30. The first scheduled installation was set for September 2, 2013, but was scheduled only for 33 of Challenger's drivers. [119] ¶¶ 31, 35. No installations took place on that date. *Id*. ¶ 35. On September 5th or 6th, Gleike attempted to upgrade Gleike's software on two to four existing Pulsar taximeters in Challenger cabs, but there were problems with the upgrade. *Id*. ¶ 38.[8]

Gleike promised to provide installations to about 30 Challenger cabs on September 7, 2013. [121] ¶ 34. On September 7, 2013, Challenger sent an email to Gleike, terminating the agreement effective immediately. [116] ¶ 26; [119] ¶ 39. The email stated, in part, that it was "now 4:00 pm [on September 7] nothing happened we did not get hold of you the whole day." [112-17] at 2. After termination, Challenger then refused to have any further dealings with Gleike and did not make any payments. [116] ¶¶ 26–27, 29. Gleike never sent Challenger any invoices. [121] ¶ 32. Less than two weeks later, on September 18, 2013, Gleike filed this suit against Challenger, Ghimai, and Ainalem.

---

[8] Challenger characterizes the attempted upgrade as a failure; Gleike admits there were problems but disputes that the attempt was a failure.

## II.    Analysis

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014); Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Challenger moves for summary judgment on Gleike's breach of contract claims, arguing that the agreement is unenforceable because it violates public policy, is unconscionable, and includes unenforceable penalties. Challenger also moves on Gleike's fraud claim on the basis that Gleike has not marshaled any evidence of fraud. Gleike moves for summary judgment on all of Challenger's counterclaims, contending that Challenger failed to comply with a notice and cure provision in the agreement, which was a condition precedent to bringing any suit against Gleike.[9]

---

[9] Both parties cite to Illinois law, likely because the governing law provision of the agreement specifies that Illinois law controls. [112-1] at 6. As neither party has disputed this provision or pointed out a conflict between bodies of law that might apply, Illinois law applies. *Thornton v. M7 Aerospace LP*, 796 F.3d 757, 766 (7th Cir. 2015).

## A.     Enforceability of the Contract

### 1.     Public Policy

Challenger argues that the August 13 agreement, as written, is void against public policy (as expressed in the D.C. regulations) because it requires Challenger to install the modern taximeters in taxicabs, not Gleike. In turn, Gleike denies that the regulations required installation to be the responsibility of the approved payment service provider. The power to declare a private contract void as illegal or contrary to public policy is to be used "sparingly," and agreements are not to be held void unless they are "clearly contrary to what the constitution, the statutes or the decisions of the courts have declared to be the public policy or unless they be manifestly injurious to the public welfare." *First Nat'l Bank of Springfield v. Malpractice Res., Inc.*, 179 Ill.2d 353, 359 (1997). The issue of whether the D.C. regulations required the responsibility for installation to be placed on the taxicab company or the approved provider (or if the responsibility could be allocated per a written agreement) need not be reached, however.[10] Whatever the parties' original agreement, they do not dispute that Gleike later agreed to assume responsibility to arrange for installation of the modern taximeters by an approved installer, thus modifying the agreement. [121] ¶ 32. Because the agreement here was modified so that the burden of installation was no longer on Challenger, Challenger cannot

---

[10] The regulations are not a model of clarity. *See*: 31 DCMR § 401.2 ([112-9] at 3); 31 DCMR §§ 603.5(b) & 603.6 ([112-10] at 4); 31 DCMR §§ 401.7(j) & 603.2(f)(3)(A) ([112-12] at 6 and at http://dcregs.dc.gov/Gateway/NoticeHome.aspx?NoticeID=4508092 for § 401.7(j)); 31 DCMR § 401.5(e) ([112-13] at 3).

show that the agreement was void against public policy, if indeed the D.C. regulations required installation to be the approved provider's responsibility.

## 2. Unconscionability

As another basis for unenforceability of the contract, Challenger argues that the agreement is unconscionable because the terms are one-sided in Gleike's favor and the contract was agreed to by Challenger under pressure to comply with the Taxicab Commission's regulation deadlines. Gleike asserts that the agreement was not one-sided, but rather merely built in certain protections for Gleike, and that the severability clause would allow for severing any unconscionable provisions, instead of voiding the contract as a whole.

Whether a contract is unconscionable is a question of law, as is the construction or interpretation of a contract. *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791, 794 (7th Cir. 2014). In Illinois, a finding of unconscionability may be based on either procedural or substantive unconscionability, or a combination of both. *Kinkel v. Cingular Wireless LLC*, 223 Ill.2d 1, 21 (2006). A contract is procedurally unconscionable if an impropriety in the process of forming the contract "deprived a party of a meaningful choice." *Hanover Ins. Co.*, 751 F.3d at 794 (citing *Kinkel,* 223 Ill.2d at 23). All circumstances surrounding the transaction must be considered, including: the manner in which the contract was entered into, whether each party had a reasonable opportunity to understand the terms of the contract, whether important terms were hidden in a maze of fine print, and the conspicuousness of clauses and negotiations relating to them. *Kinkel*, 223 Ill.2d at 23 (citing *Frank's Maint. & Eng'g, Inc. v. C. A. Roberts Co.*, 86 Ill.App.3d 980, 989–

90 (1st Dist. 1980)). A contract is substantively unconscionable when the terms of a contract are "totally one-sided or harsh." *Hanover Ins. Co.*, 751 F.3d at 794 (citing *Bishop v. We Care Hair Dev. Corp.,* 316 Ill.App.3d 1182, 1196 (1st Dist. 2000)).

There are some indicators of procedural unconscionability here. One factor that sets this case apart from the typical commercial negotiation is the nature of Challenger. It is a cooperative composed of drivers who mostly hale from Eritrea. [119] ¶ 2. Gleike's representative testified that unlike the other taxicab companies with whom he engaged, it was more difficult for him to understand Challenger's representatives because "they [were] not sophisticated" and "really they did not understand how this process worked with the City." [112-2] at 19.

The circumstances surrounding the transaction also suggest that, to a degree, Challenger was deprived of "a meaningful choice" in forming the contract because of the D.C. regulations. The rules imposed a rapidly approaching deadline and a requirement that Challenger contract with an approved provider, of which there were only seven in the D.C. area. Challenger's previous arrangement with an approved provider fell through in early August, less than two weeks before the extension deadline. If Challenger did not get the required systems installed by September 1, or receive 30-day extensions for its drivers (through an approved provider), its drivers would be either unable to operate their taxicabs or be exposed to fines and penalties. To obtain extensions for its drivers under the regulations, Challenger needed to contract with an approved provider, who in turn needed apply for those extensions on the drivers' behalf before August 15, 2013. *See* 31 DCMR

§§ 401.7(a) & (b), 603.2(f) ([112-12] at 3, 6). When its first contract fell through, Challenger sought guidance from the Taxicab Commission's Chief of Operations, who strongly recommended that Challenger work with Gleike. [119] ¶¶ 15–16. Challenger entered into an agreement with Gleike shortly thereafter, on August 13, 2013. [116] ¶ 9; [119] ¶ 17. Gleike was not aware of the specifics of the Commission's emergency rules until after it signed the August 13 agreement with Challenger, but Gleike did know that it would be applying for extensions on behalf of the drivers. [119] ¶ 12; [112-2] at 10. So Challenger lacked commercial sophistication, faced a near-term deadline that could put its drivers out of business, was limited to contracting with only providers approved by the Commission, and was advised by the Commission to sign with Gleike. In combination, these circumstances indicate that Challenger lacked a meaningful choice during the formation of the contract.

On the other hand, these difficulties were not necessarily due to any action by Gleike. Importantly, prior to executing the agreement, Gleike's representative met with six to eight Challenger representatives on two separate occasions, and spent at least four hours going over the terms of the agreement, [123] ¶ 10, which weighs against a finding of procedural unconscionability. And there is no indication that contract terms were hidden in fine print or otherwise. *See, e.g., Kinkel*, 223 Ill.2d at 23. There is insufficient proof of procedural unconscionability—especially on Gleike's part—to render the agreement unenforceable on that basis alone.

However, even if a degree of procedural unconscionability is insufficient to render an agreement unenforceable, it is a factor to be considered in the question of substantive unconscionability. *Kinkel*, 223 Ill.2d at 27. Substantive unconscionability looks to the actual terms of the contract and examines "the relative fairness of the obligations assumed." *Id.* at 28. For transactions between two commercial entities, the doctrine questions whether the terms are "commercially reasonable." *Id.* (citing *Frank's Maint.,* 86 Ill.App.3d at 990–91). And although "[c]ourts are generally reluctant to use the unconscionability doctrine to rewrite the terms of contracts into which educated businessmen have entered," *Dillman & Associates, Inc. v. Capitol Leasing Co.*, 110 Ill.App.3d 335, 341 (4th Dist. 1982), "the existence of a commercial setting is not of itself sufficient insulation against a charge of unconscionability." *Frank's Maint.*, 86 Ill.App.3d at 989.

The agreement effectively shields Gleike from liability for any breach of the contract. It states that Gleike makes no representations or warranties as to its credit card processing services and modern taximeter equipment, which are provided "as is." [112-1] at 3; [119] ¶¶ 22–23.[11] For the credit card processing services, "[Gleike's] *only* liability to [Challenger] arising from interruption in, delay or unavailability of, the Services shall be to restore the Services as promptly as reasonably practicable. No interruption, delay, unavailability, error or omission with regard to Services shall relieve [Challenger] of the obligation to pay or

---

[11] Neither party argues that the Illinois Uniform Commercial Code on sales of goods, including the statute on unconscionable contracts 810 ILCS 5/2-302, applies to this agreement, likely because the agreement provides for both goods and services.

otherwise perform under this Agreement." [112-1] at 3 (emphasis added); [119] ¶ 22. Similarly, for the modern taximeter equipment, "[Gleike] shall not be liable for any losses or damages by reason of failure of the Equipment to operate or faulty operation of the Equipment. No defect or unfitness of the Equipment shall relieve the Customer of the obligation to pay or otherwise perform under this Agreement." [112-1] at 3; [119] ¶ 23. The agreement further limited Challenger's remedies against Gleike, stating that "[i]n no event shall [Gleike] . . . be liable under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby excluded by agreement of the parties, regardless of whether such damages were foreseeable or whether [Gleike] has been advised of the possibility of such damages." [112-1] at 6.

Under these provisions, Gleike could provide faulty taximeter equipment that never worked or credit card processing services that were constantly unavailable, yet Challenger would still be required to perform—i.e., pay Gleike—and could not hold Gleike liable for its actual damages. Gleike claims that it could be held liable for failing to provide operational services and equipment, but fails to identify any remedy available to Challenger, other than requiring Gleike to restore credit card processing services "as promptly as reasonably practicable." While "[r]easonable agreements which limit or modify remedies will be given effect," "parties are not free to shape their remedies in an unreasonable or unconscionable way." *Frank's Maint.*, 86 Ill.App.3d at 991. The contract insulated Gleike from liability while

14

requiring Challenger to continue performance, even if it had not received the benefit of its bargain. As such, these terms are not "commercially reasonable." *Id*. at 990.

The oppressiveness of the agreement is further illustrated by the one-sidedness of termination-related provisions. Gleike had the unilateral right to terminate the agreement at will—and without notice—for breaches by Challenger, while Challenger had no such right to terminate the agreement in response to breaches by Gleike. [119] ¶ 24. Unlike Gleike, Challenger also faced restrictions on bringing suit: Challenger was required to give notice of the breach or violation within 30 days and allow 60 days for a cure, while Gleike was under no such condition precedent. [112-1] at 6; [116] ¶ 11.

The agreement did permit either party to terminate at will with 30 days' notice. [119] ¶ 24. However, upon termination of the agreement "for any reason," Challenger was required to pay Gleike a "termination fee" of $200 per cab, regardless of who terminated the agreement. [119] ¶ 20; [112-1] at 5. Challenger argues that this termination fee is an unenforceable penalty. "Illinois law draws a distinction between liquidated damages, which are enforceable, and penalties, which are not." *Checkers Eight Ltd. P'ship v. Hawkins*, 241 F.3d 558, 561 (7th Cir. 2001). Whether a provision is a penalty clause is a question of law. *Id*. at 562. A clause is a liquidated damages provision if: (1) the actual damages from a breach are difficult to measure at the time the contract was made; and (2) the specified amount of damages is reasonable in light of the anticipated or actual loss caused by the breach. *Id*. A clause is likely a penalty if it is not a reasonable attempt to

estimate actual damages—for example, "if the amount of damages is invariant to the gravity of the breach." *Id.*; *see XCO Int'l Inc. v. Pac. Sci. Co.*, 369 F.3d 998, 1004 (7th Cir. 2004) ("The element common to most liquidated damages clauses that get struck down as penalty clauses is that they specify the same damages regardless of the severity of the breach."). Similarly, a clause is a penalty when its sole purpose "is to secure performance of the contract." *Checkers Eight Ltd.*, 241 F.3d at 562.

Gleike argues that the $200 per cab termination fee was intended to cover Gleike's cancellation fees with T-Mobile (for SIM cards) or—if it had not paid T-Mobile or the cancellation fees did not apply—to make a profit. [119] ¶ 20; [112-4] at 7–8. But even if Challenger breached the contract and Gleike incurred actual cancellation fees from T-Mobile, these cancellation fees would not be "difficult to measure"—either at the time of contracting or time of any breach. Also, in arguing that the termination fee was merely bargained-for consideration, Gleike admits that the termination fee was "not a measurement of damages in the event of a breach." [118] at 9. Requiring a termination fee regardless of the circumstances surrounding termination—even if, for example, Gleike had materially breached the contract or never paid T-Mobile, or if Gleike chose to terminate the contract with 30 days' notice—does not tie any damage estimate to a breach by Challenger, and therefore the termination fee is "not a reasonable attempt to estimate actual damages."

*Checkers Eight Ltd.*, 241 F.3d at 562. The $200 termination fee is an unenforceable penalty.[12]

The harshness of the agreement is further illustrated by terms unilaterally shifting Gleike's attorney fees and costs for litigation (or any informal dispute) onto Challenger, regardless of outcome or merit. Specifically, the agreement provides that "in any action by [Gleike] against [Challenger] arising out of or related to this Agreement (including any and all appeals), [Gleike] shall be entitled to recover from [Challenger] the actual expense of litigation, including actual attorneys' fees and costs, *regardless of the outcome*." [119] ¶ 27 (emphasis added); [112-1] at 5. An identical provision gave Gleike the right to recover such costs "in handling any administrative or informal disputes with [Challenger]"—again "regardless of the outcome." [119] ¶ 27; [112-1] at 5.

To the extent that these provisions require an award of attorney fees to a non-prevailing party, they are unenforceable. Under Illinois law, a party who materially breaches the contract may not enforce the contract, take advantage of the terms of the contract that benefit it, or recover damages from the other party to the contract. *James v. Lifeline Mobile Medics*, 341 Ill.App.3d 451, 455 (4th Dist. 2003). Rather, the party seeking to enforce a contract has the burden of proving substantial compliance with all material terms of the agreement. *Id.* "[A] policy that

---

[12] Unlike the termination fee, however, the activation fees ($50 per cab) and fees related to non-surrendered taximeters ($300 per cab) appear to involve bargained-for consideration between the parties, rather than a penalty for terminating the contract, and therefore are not clearly unconscionable.

enabled the breaching party to collect attorney fees for the ensuing lawsuit" would result in "unfairness" because "[t]he wronged party would not only suffer damages from the breach, but could conceivably be fiscally prevented from seeking relief." *Atlantis Prods., Inc. v. Meridian Fence & Sec., L.P.*, 2012 IL App (2d) 110521-U, ¶ 55; *see also City of Harvard v. Elvis J. Henson Trust*, 2012 IL App (2d) 120091-U, ¶ 21 (even if the plain language of a fee-shifting provision does not expressly require the party to be the "prevailing party" to recover attorney fees, such a finding is necessary because "attorney fees may only be awarded to a prevailing party"). Awarding attorney fees and costs to only one party, regardless of the outcome, could discourage injured parties from asserting their rights.

There is an overall imbalance here—one that insulates Gleike from liability and risk, requires Challenger's performance, and penalizes Challenger for termination regardless of cause. Importantly, Gleike points to no real remedy available to Challenger if Gleike breached materials terms of the agreement (other than prompt restoration of credit card processing); rather, Challenger would be required to continue its performance under the contract, pay a termination fee if it terminated the contract, and pay for Gleike's legal fees in any resulting litigation. These terms are so "commercially unreasonable" and "so one-sided as to oppress" Challenger that they are substantively unconscionable and unenforceable,

especially when—on top of all that—there were indicators of procedural unconscionability present during formation of the contract.[13]

The question then remains whether these contract terms are severable. A court may sever the unenforceable portion of an agreement and enforce the remainder if the stricken portion "is not essential to the bargain," but "an entire contract or a clause therein fails if the stricken portion constitutes an essential term of the contract or clause." *Kinkel*, 223 Ill.2d at 46–47; *see Wigginton v. Dell, Inc.*, 382 Ill.App.3d 1189, 1198 (5th Dist. 2008) ("An unenforceable provision is severable unless it is 'so closely connected' with the remainder of the contract that to enforce the valid provisions of the contract without it 'would be tantamount to rewriting the [a]greement.'") (quoting *Abbott–Interfast Corp. v. Harkabus,* 250 Ill.App.3d 13, 21 (2d Dist. 1993)). The existence of a severability clause is relevant to this determination, but not dispositive. *Wigginton*, 382 Ill.App.3d at 1198 (citing *Abbott–Interfast Corp.,* 250 Ill.App.3d at 21).

The August 13 agreement does include a severability clause. While the terms of the legal fee-shifting provision could be modified and severed without affecting

---

[13] Although not an argument raised by Challenger or briefed by the parties, the agreement also appears to conflict with certain requirements in the Taxicab Commission's emergency regulations. 31 DCMR §§ 401.7(b)(3) and 602.3(f)(3) specified that for an approved provider and taxicab company to be eligible for an extension application, the approved provider and taxicab company needed to have an agreement in writing which provided that: (1) the taxicab company could cancel the contract, without penalty, if the provider failed to obtain an extension, and (2) by September 30, the provider would install a fully-operational modern taximeter system in each vehicle subject to the extension. [112-12] at 3, 6. Gleike applied for and received extensions on Challenger's behalf even though their written agreement did not require installation by September 30 or allow for cancellation without penalty.

the essential terms, the other unconscionable provisions in this case—which insulate Gleike from liability for breach while requiring Challenger to perform regardless and which include unenforceable termination penalties—go to the heart of the bargain between Challenger and Gleike, and are not merely discrete provisions easily severable from the agreement. Therefore, the contract is unenforceable as a whole.

Because their contract is void, Challenger is entitled to judgment on Gleike's breach of contract claim against it (and Gleike is also entitled to judgment on Challenger's breach of contract counterclaim against it).

### 3.    Notice and Cure Provision

The unenforceability of the contract moots Gleike's argument that Challenger's counterclaims are barred for failure to comply with the agreement's notice and cure provision. Challenger may pursue its (non-contract) counterclaims without giving pre-suit notice because the entire contract is void. But even if the contract were enforceable, the notice and cure provision would not bar Challenger's counterclaims because notice would be futile for the driver's assigned claims and there are questions of fact as to whether a prior material breach excused Challenger from giving notice.

The "Liability" section of the agreement provided:

No action at law or in equity arising out of or related to this Agreement shall be brought by [Challenger] against [Gleike], including but not limited to breach of this Agreement and/or violation of any law now in effect or hereafter enacted, unless [Challenger] provides [Gleike] with a written notice within thirty (30) days from the date of such alleged breach or violation, and provided [Gleike] does not remedy or correct

the breach or violation within sixty (60) days from the receipt of the notice.

[112-1] at 6; [116] ¶ 11. Challenger terminated the contract on September 7, 2013, and Gleike filed suit less than two weeks later, on September 18, 2013. Challenger filed its counterclaims (in response to an amended complaint) in April 2014. [47]. Challenger does not deny that it failed to comply with the notice and cure provision prior to bringing its counterclaims, but argues that claims brought as assignee of its drivers' claims are exempt from that provision, and that its own claims should be excused because of futility and Gleike's breach of the contract.

The individual drivers were not bound by the notice and cure provision, see [120] at 2, [121] ¶ 33, and as assignee, Challenger does not take on obligations not applicable to the drivers. But in any event, Gleike admits that it would have been clearly impractical for Challenger to provide Gleike with notice and an opportunity to cure the drivers' grievances. [120] at 3. "The law does not require a futile act." *Hardy v. City Optical Inc.*, 39 F.3d 765, 770 (7th Cir. 1994) (citing *Geary v. Dominick's Finer Foods, Inc.*, 129 Ill.2d 389, 400 (1989)); *Geary*, 129 Ill.2d at 400; *First Am. Disc. Corp. v. Jacobs*, 324 Ill.App.3d 997, 1012 (1st Dist. 2001). Therefore, if the contract were not void, the notice requirement would not bar Challenger's counterclaims brought as assignee of the drivers' claims.

For its own claims against Gleike, Challenger says that Gleike materially breached the contract first (e.g., by failing to timely install the meters) and Gleike's suit made notice from Challenger futile. Gleike responds that any breach on its part was not incurable, and it was Challenger who acted unilaterally first. Futility and

material breach may excuse the other party from performing its obligations under the contract. *Hardy*, 39 F.3d at 770; *Elda Arnhold & Byzantio, L.L.C. v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 700 (7th Cir. 2002); *William Blair & Co., LLC v. FI Liquidation Corp.*, 358 Ill.App.3d 324, 346 (1st Dist. 2005). Material breach, however, "is a complicated question of fact." *William Blair & Co.*, 358 Ill.App.3d at 346–47 (quoting *Sahadi v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago*, 706 F.2d 193, 196 (7th Cir. 1983)).

If the contract were not void, the parties' acts of modifying their written agreement would preclude judgment as a matter of law on the viability of the notice and cure provision.[14] The contours of the final agreement between the parties (for example, Gleike's precise obligations for installation and obtaining extensions) are disputed, and therefore whether there was a material breach excusing performance with the notice and cure provision cannot be resolved at summary judgment. *See, e.g., E.A. Cox Co. v. Rd. Savers Int'l Corp.*, 271 Ill.App.3d 144, 152 (1st Dist. 1995) ("When extrinsic evidence is introduced to establish a subsequent modification of a written contract or to establish that a provision of a written contract has been waived, the question of the final agreement of the parties is usually one of fact for the jury.").

---

[14] Illinois law is "well settled" that "the terms of a written contract can be modified by a subsequent oral agreement even though, as in this case, the contract precludes oral modifications." *Tadros v. Kuzmak*, 277 Ill.App.3d 301, 312 (1st Dist. 1995).

### B.    Fraud

Challenger moves for summary judgment on Gleike's fraud claim, contending that there is no evidence that Challenger fraudulently induced Gleike into the agreement. Gleike clarifies that its claim sounds in promissory fraud, which under Illinois law is only actionable if the promise is part of a "scheme to defraud." *BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC*, 664 F.3d 131, 136 (7th Cir. 2011).

Gleike argues that Challenger engaged in a scheme to defraud by entering into the agreement with Gleike for the sole purpose of having Gleike obtain installation extensions for its drivers while it intended to terminate the agreement when DC Tops LLC became an approved provider. [118] at 10. Gleike's evidence to support its promissory fraud claim is that: (1) DC Tops was negotiating to become an approved payment service provider, using VeriFone technology; (2) in August 2013, three Challenger drivers told a Gleike employee that Challenger was waiting for DC Tops to become an approved provider and then would terminate the contract; and (3) DC Tops paid Challenger's legal fees.

Even if these facts were true, which Challenger disputes, they do not show that at the time Challenger entered into the contract, it falsely promised to perform the agreement as part of a "scheme to defraud" Gleike. "A claim for fraud, promissory or otherwise, requires a showing that, *at the time the allegedly fraudulent statement was made,* it was an intentional misrepresentation. For promissory fraud claims, this requirement means that, when the promise was made, the promisor had no intent to fulfill it; if the promisor simply later changed his mind, an action for fraud will not lie." *Ass'n Ben. Servs., Inc. v. Caremark RX,*

*Inc.*, 493 F.3d 841, 853 (7th Cir. 2007) (emphasis in original). A scheme to defraud requires conduct that is "particularly egregious" or "embedded in a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy." *Desnick v. Am. Broad. Cos., Inc.*, 44 F.3d 1345, 1354 (7th Cir. 1995) (applying Illinois law). Even if some Challenger drivers stated that Challenger would terminate the contract if DC Tops became an approved provider, these were merely statements of "future promise or intent" to breach a contract and are not indicative of "particularly egregious" conduct or a "larger pattern of deception" that would constitute a scheme to defraud, or that Challenger's "promise to perform it had been fraudulent when made—that is, that [Challenger] had never intended to perform it." *BPI Energy Holdings*, 664 F.3d at 137. And DC Tops's actions in attempting to become an approved provider or in paying Challenger's legal fees, even if true, do not suggest *Challenger's* fraudulent intent at the time the parties entered into the contract.

Because Gleike has failed to raise a genuine issue of fact as to promissory fraud, Challenger's motion for summary judgment is granted on this claim.

## III. Conclusion

Challenger's motion for summary judgment, [109], is granted. Gleike's motion for summary judgment, [106], is denied.

ENTER:

Manish S. Shah
United States District Judge

Date: 4/13/16